# MICHIGAN *v.* HARVEY

No. 88–512.   Argued October 11, 1989—Decided March 5, 1990

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and BLACKMUN, JJ., joined, *post*, p. 355.

*Timothy A. Baughman* argued the cause and filed a brief for petitioner.

*Robert M. Morgan* argued the cause and filed a brief for respondent.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

In *Michigan* v. *Jackson,* 475 U. S. 625 (1986), the Court established a prophylactic rule that once a criminal defendant invokes his Sixth Amendment right to counsel, a subsequent waiver of that right—even if voluntary, knowing, and intelligent under traditional standards—is presumed invalid if secured pursuant to police-initiated conversation. We held that statements obtained in violation of that rule may not be admitted as substantive evidence in the prosecution's case in chief. The question presented in this case is whether the

---

*\*Acting Solicitor General Bryson* and *Assistant Attorney General Dennis* filed a brief for the United States as *amicus curiae* urging reversal.

*Steven R. Shapiro* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

prosecution may use a statement taken in violation of the *Jackson* prophylactic rule to impeach a defendant's false or inconsistent testimony. We hold that it may do so.

Respondent Tyris Lemont Harvey was convicted of two counts of first-degree criminal sexual conduct in connection with the rape of Audrey Sharp on June 11, 1986. Harvey was taken into custody on July 2, 1986, and on that date, he made a statement to an investigating officer. He was arraigned later on July 2, and counsel was appointed for him. More than two months later, Harvey told another police officer that he wanted to make a second statement, but did not know whether he should talk to his lawyer. Although the entire context of the discussion is not clear from the record, the officer told respondent that he did not need to speak with his attorney, because "his lawyer was going to get a copy of the statement anyway." App. 32–33 (stipulation of prosecution). Respondent then signed a constitutional rights waiver form, on which he initialed the portions advising him of his right to remain silent, his right to have a lawyer present before and during questioning, and his right to have a lawyer appointed for him prior to any questioning. App. to Pet. for Cert. 3a–4a.[1] Asked whether he understood his constitutional rights, respondent answered affirmatively. He then gave a statement detailing his version of the events of June 11.

At a bench trial, Sharp testified that Harvey visited her home at 2:30 a.m. on the date in question and asked to use the telephone. After placing a call, Harvey confronted Sharp with a barbecue fork, and a struggle ensued. According to Sharp, respondent struck her in the face, threatened her with the fork and a pair of garden shears, and eventually threw her to the floor of her kitchen. When she ran to the living room to escape, Harvey pursued her with the weapons,

---

[1] Harvey declined to initial portions of the waiver form explaining that anything he said could be used against him in court, and that he could decide at any time to exercise his rights and not answer any questions or make any statement. App. to Pet. for Cert. 4a.

demanded that she take off her clothes, and forced her to engage in sexual acts.

Harvey testified in his own defense and presented a conflicting account of the night's events. He claimed that he had gone to Sharp's home at 9 p.m. and invited her to smoke some crack cocaine, which he offered to supply in return for sexual favors. She agreed, but after smoking the cocaine, she refused to perform the favors. When respondent would not leave her house, Sharp allegedly grabbed the barbecue fork and threatened him, triggering a brief fight during which he grabbed the fork and threw it to the floor. The two then moved to the living room, where, according to Harvey, Sharp voluntarily removed her clothes. He testified, however, that the two never engaged in sexual intercourse and that he left shortly thereafter.

On cross-examination, the prosecutor used Harvey's second statement to the police to impeach his testimony. Before doing so, the prosecutor stipulated that the statement "was not subject to proper Miranda," App. 32, and therefore could not have been used in the case in chief. But because the statement was voluntary, the prosecutor argued that it could be used for impeachment under our decision in *Harris* v. *New York*, 401 U. S. 222 (1971). Defense counsel did not object, App. 34; App. to Pet. for Cert. 5a, and the trial court permitted the questioning. The prosecutor then impeached certain of Harvey's statements, including his claim that he had thrown the barbecue fork to the floor, by showing that he had omitted that information from his statement to the police. App. 36–45.[2] The trial judge believed the victim's testimony and found respondent guilty as charged.

___

[2] Respondent also told police that another man and woman had been present in Sharp's house on the night of the incident and that he thought the man's name was "Michael." At trial, however, respondent said that he did not know the man's name. App. 36–37. Respondent further testified that "Michael" had brought some cocaine to Sharp's home, but his statement to police only mentioned cocaine that respondent had provided. *Id.*, at 39.

The Michigan Court of Appeals reversed the conviction. The court noted that if the second statement had been taken only in violation of the rules announced in *Miranda* v. *Arizona,* 384 U. S. 436 (1966), it could have been used to impeach Harvey's testimony. It held, however, that the statement was inadmissible even for impeachment purposes, because it was taken "in violation of defendant's Sixth Amendment right to counsel. See *e. g., Michigan v. Jackson,* 475 US 625." App. to Pet. for Cert. 6a–7a. Because the trial "involved a credibility contest between defendant and the victim," the court concluded that the impeachment was not harmless beyond a reasonable doubt. *Id.,* at 7a. The Michigan Supreme Court denied leave to appeal, three justices dissenting, and we granted certiorari. 489 U. S. 1010 (1989). We now reverse.

To understand this case, it is necessary first to review briefly the Court's jurisprudence surrounding the Sixth Amendment. The text of the Amendment provides in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." The essence of this right, we recognized in *Powell* v. *Alabama,* 287 U. S. 45 (1932), is the opportunity for a defendant to consult with an attorney and to have him investigate the case and prepare a defense for trial. *Id.,* at 58, 71. More recently, in a line of cases beginning with *Massiah* v. *United States,* 377 U. S. 201 (1964), and extending through *Maine* v. *Moulton,* 474 U. S. 159 (1985), the Court has held that once formal criminal proceedings begin, the Sixth Amendment renders inadmissible in the prosecution's case in chief statements "deliberately elicited" from a defendant without an express waiver of the right to counsel. See also *United States* v. *Henry,* 447 U. S. 264 (1980); *Brewer* v. *Williams,* 430 U. S. 387 (1977). For the fruits of postindictment interrogations to be admissible in a prosecution's case in chief, the State must prove a voluntary, knowing, and intelligent relinquishment of the Sixth Amendment

right to counsel. *Patterson* v. *Illinois,* 487 U. S. 285, 292, and n. 4 (1988); *Brewer, supra,* at 404. We have recently held that when a suspect waives his right to counsel after receiving warnings equivalent to those prescribed by *Miranda* v. *Arizona, supra,* that will generally suffice to establish a knowing and intelligent waiver of the Sixth Amendment right to counsel for purposes of postindictment questioning. *Patterson* v. *Illinois, supra.*

In *Michigan* v. *Jackson,* 475 U. S. 625 (1986), the Court created a bright-line rule for deciding whether an accused who has "asserted" his Sixth Amendment right to counsel has subsequently waived that right. Transposing the reasoning of *Edwards* v. *Arizona,* 451 U. S. 477 (1981), which had announced an identical "prophylactic rule" in the Fifth Amendment context, see *Solem* v. *Stumes,* 465 U. S. 638, 644 (1984), we decided that after a defendant requests assistance of counsel, any waiver of Sixth Amendment rights given in a discussion initiated by police is presumed invalid, and evidence obtained pursuant to such a waiver is inadmissible in the prosecution's case in chief. *Jackson, supra,* at 636. Thus, to help guarantee that waivers are truly voluntary, *Jackson* established a presumption which renders invalid some waivers that would be considered voluntary, knowing, and intelligent under the traditional case-by-case inquiry called for by *Brewer* v. *Williams.*

There is no dispute in this case that respondent had a Sixth Amendment right to counsel at the time he gave the statement at issue. The State further concedes that the police transgressed the *Jackson* rule, because the colloquy between respondent and the investigating officer "cannot be viewed as defendant-initiated interrogation." Tr. of Oral Arg. 52. The question, then, is whether a statement to police taken in violation of *Jackson* can be admitted to impeach a defendant's inconsistent trial testimony.

*Michigan* v. *Jackson* is based on the Sixth Amendment, but its roots lie in this Court's decisions in *Miranda* v. *Ari-*

*zona, supra,* and succeeding cases. *Miranda,* of course, required police interrogators to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments and set forth a now-familiar set of suggested instructions for that purpose. Although recognizing that the *Miranda* rules would result in the exclusion of some voluntary and reliable statements, the Court imposed these "prophylactic standards" on the States, see *Michigan* v. *Tucker,* 417 U. S. 433, 446 (1974), to safeguard the Fifth Amendment privilege against self-incrimination. *Edwards* v. *Arizona* added a second layer of protection to the *Miranda* rules, holding that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." 451 U. S., at 484. *Edwards* thus established another prophylactic rule designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights. See *Oregon* v. *Bradshaw,* 462 U. S. 1039, 1044 (1983) (plurality opinion).

*Jackson* simply superimposed the Fifth Amendment analysis of *Edwards* onto the Sixth Amendment. Reasoning that "the Sixth Amendment right to counsel at a postarraignment interrogation requires at least as much protection as the Fifth Amendment right to counsel at any custodial interrogation," *Jackson, supra,* at 632, the Court in *Jackson* concluded that the *Edwards* protections should apply when a suspect charged with a crime requests counsel outside the context of interrogation. This rule, like *Edwards,* is based on the supposition that suspects who assert their right to counsel are unlikely to waive that right voluntarily in subsequent interrogations.

We have already decided that although statements taken in violation of only the prophylactic *Miranda* rules may not be used in the prosecution's case in chief, they are admissible to impeach conflicting testimony by the defendant. *Harris* v.

*New York,* 401 U. S. 222 (1971); *Oregon* v. *Hass,* 420 U. S. 714 (1975). The prosecution must not be allowed to build its case against a criminal defendant with evidence acquired in contravention of constitutional guarantees and their corresponding judicially created protections. But use of statements so obtained for impeachment purposes is a different matter. If a defendant exercises his right to testify on his own behalf, he assumes a reciprocal "obligation to speak truthfully and accurately," *Harris,* 401 U. S., at 225, and we have consistently rejected arguments that would allow a defendant to "'turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.'" *Id.,* at 224 (quoting *Walder* v. *United States,* 347 U. S. 62, 65 (1954)). See also *Hass, supra,* at 722; *United States* v. *Havens,* 446 U. S. 620, 626 (1980).

There is no reason for a different result in a *Jackson* case, where the prophylactic rule is designed to ensure voluntary, knowing, and intelligent waivers of the Sixth Amendment right to counsel rather than the Fifth Amendment privilege against self-incrimination or "right to counsel." We have mandated the exclusion of reliable and probative evidence for *all* purposes only when it is derived from involuntary statements. *New Jersey* v. *Portash,* 440 U. S. 450, 459 (1979) (compelled incriminating statements inadmissible for impeachment purposes); *Mincey* v. *Arizona,* 437 U. S. 385, 398 (1978) (same). We have never prevented use by the prosecution of relevant voluntary statements by a defendant, particularly when the violations alleged by a defendant relate only to procedural safeguards that are "not themselves rights protected by the Constitution," *Tucker, supra,* at 444 (*Miranda* rules), but are instead measures designed to ensure that constitutional rights are protected. In such cases, we have decided that the "search for truth in a criminal case" outweighs the "speculative possibility" that exclusion of evidence might deter future violations of rules not compelled di-

rectly by the Constitution in the first place. *Hass, supra,* at 722–723; *Havens, supra,* at 627 (reaffirming *Hass*). *Hass* was decided 15 years ago, and no new information has come to our attention which should lead us to think otherwise now.

Respondent argues that there should be a different exclusionary rule for *Jackson* violations than for transgressions of *Edwards* and *Miranda.* The distinction, he suggests, is that the adversarial process has commenced at the time of a *Jackson* violation, and the postarraignment interrogations thus implicate the constitutional guarantee of the Sixth Amendment itself. But nothing in the Sixth Amendment prevents a suspect charged with a crime and represented by counsel from voluntarily choosing, on his own, to speak with police in the absence of an attorney. We have already held that a defendant whose Sixth Amendment right to counsel has attached by virtue of an indictment may execute a knowing and intelligent waiver of that right in the course of a police-initiated interrogation. *Patterson* v. *Illinois,* 487 U. S. 285 (1988). To be sure, once a defendant obtains or even requests counsel as respondent had here, analysis of the waiver issue changes. But that change is due to the protective rule we created in *Jackson* based on the apparent inconsistency between a request for counsel and a later voluntary decision to proceed without assistance. See 487 U. S., at 290, n. 3.; cf. *Michigan* v. *Mosley,* 423 U. S. 96, 110, n. 2 (1975) (WHITE, J., concurring in result).

In other cases, we have explicitly declined to hold that a defendant who has obtained counsel cannot himself waive his right to counsel. See *Brewer,* 430 U. S., at 405–406 ("The Court of Appeals did not hold, nor do we, that under the circumstances of this case Williams *could not,* without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments. It only held, as do we, that he did not") (emphasis in original); *Estelle* v. *Smith,* 451 U. S. 454, 471–472, n. 16 (1981) ("We do not hold that respondent was precluded from waiving this constitutional right [to coun-

sel]. . . . No such waiver has been shown, or even alleged, here"). A defendant's right to rely on counsel as a "medium" between the defendant and the State attaches upon the initiation of formal charges, *Moulton*, 474 U. S., at 176, and respondent's contention that a defendant cannot execute a valid waiver of the right to counsel without first speaking to an attorney is foreclosed by our decision in *Patterson*. Moreover, respondent's view would render the prophylactic rule adopted in *Jackson* wholly unnecessary, because even waivers given during *defendant-initiated* conversations would be *per se* involuntary or otherwise invalid, unless counsel were first notified.

Although a defendant may sometimes later regret his decision to speak with police, the Sixth Amendment does not disable a criminal defendant from exercising his free will. To hold that a defendant is inherently incapable of relinquishing his right to counsel once it is invoked would be "to imprison a man in his privileges and call it the Constitution." *Adams* v. *United States ex rel. McCann*, 317 U. S. 269, 280 (1942). This we decline to do. Both *Jackson* and *Edwards* establish prophylactic rules that render some otherwise valid waivers of constitutional rights invalid when they result from police-initiated interrogation, and in neither case should "the shield provided by [the prophylactic rule] be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Harris*, 401 U. S., at 226.

Respondent and *amici* assert, alternatively, that the conduct of the police officer who took Harvey's second statement violated the "core value" of the Sixth Amendment's constitutional guarantee, and under those circumstances, the second statement may not be used even for impeachment purposes. They contend that respondent was affirmatively misled as to his need for counsel, and his purported waiver is therefore invalid. But on the record before us, it is not possible to determine whether Harvey's waiver was knowing and volun-

tary. The state courts developed no record on that issue, and the Michigan Court of Appeals did not rest its holding on any such determination. There was no testimony on this point before the trial court. The only statement in the trial record concerning the issue of waiver is the prosecutor's concession that the second statement was taken in violation of respondent's *Miranda* rights. But that concession is consistent with the Michigan Court of Appeals' finding that the police violated *Jackson*, which is, after all, only a Sixth Amendment analogue to the *Miranda* and *Edwards* decisions. The Michigan court made no independent inquiry into whether there had been an otherwise valid waiver of the right to counsel, and respondent's counsel himself conceded that, putting aside the prosecutor's concession, the record is insufficient to determine whether there was a voluntary waiver of Sixth Amendment rights. Tr. of Oral Arg. 31–32. In short, the issue was never litigated in this case.

Because respondent's counsel did not object at trial to the use of his second statement for impeachment purposes, the State had no occasion to offer evidence to establish that Harvey gave a knowing and voluntary waiver of his right to counsel under traditional standards. On remand, the Michigan courts are free to conduct a hearing on that question. It is the State's burden to show that a waiver is knowing and voluntary, *Brewer* v. *Williams, supra,* at 404, and if all the circumstances in a particular case show that the police have engaged in a course of conduct which would render the waiver involuntary, the burden will not be satisfied. Those facts are not before us, however, and we need not consider the admissibility for impeachment purposes of a voluntary statement obtained in the absence of a knowing and voluntary waiver of the right to counsel.

The judgment of the Michigan Court of Appeals is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE BRENNAN, JUS-
TICE MARSHALL, and JUSTICE BLACKMUN join, dissenting.

The question presented by this case, as I understand it, is
whether the State may initiate a private interview with an
indicted and represented defendant to obtain impeachment
evidence for use at trial. The answer to that question should
be plain: "The Sixth Amendment guarantees the accused, at
least after the initiation of formal charges, the right to rely on
counsel as a 'medium' between him and the State." *Maine* v.
*Moulton*, 474 U. S. 159, 176 (1985). This right to rely on
counsel applies whether the State is seeking evidence for use
in its case in chief, rebuttal evidence, information about trial
strategy, or material for use as impeachment.

The Court, couching its conclusion in the language of
"prophylactic rules," seemingly answers this question in the
affirmative. It reasons as follows: Although *Michigan* v.
*Jackson*, 475 U. S. 625 (1986), is based on the Sixth Amend-
ment, it protects only Fifth Amendment values; the Fifth
Amendment does not prohibit the introduction of statements
taken after the accused has invoked his right to counsel for
use as impeachment; therefore, the Sixth Amendment, as in-
terpreted in *Jackson*, does not prohibit the use of evidence
taken in violation of its strictures for impeachment at trial.
The Court's syllogism is flawed from the beginning. Only
two Terms ago, we made clear that the constitutional rule
recognized in *Jackson* is based on the Sixth Amendment in-
terest in preserving "the integrity of an accused's choice to
communicate with police only through counsel." *Patterson*
v. *Illinois*, 487 U. S. 285, 291 (1988). The Court should ac-
knowledge as much and hold that the Sixth Amendment is vi-
olated when the fruits of the State's impermissible encounter
with the represented defendant are used for impeachment
just as it is when the fruits are used in the prosecutor's case
in chief.

## I

To explain the error of the Court's analysis, it is appropriate to start where the Court does with the difference between the Fifth and Sixth Amendments and the values each serves. The Fifth Amendment protects against compelled self-incrimination.[1] It prevents a criminal defendant from being made "'the deluded instrument of his own conviction.'" *Culombe* v. *Connecticut*, 367 U. S. 568, 581 (1961) (opinion of Frankfurter, J.) (quoting 2 W. Hawkins, Pleas of the Crown 595 (8th ed. 1824)). Our decisions in *Miranda* and its progeny primarily safeguard that right against "the compulsion inherent in custodial surroundings." *Miranda* v. *Arizona*, 384 U. S. 436, 458 (1966). The initiation by the police of contact with an unrepresented defendant, after the invocation of the right to counsel during interrogation or at arraignment, creates an irrebuttable presumption that a defendant's waiver of his privilege against compelled self-incrimination is not voluntary. See *Edwards* v. *Arizona*, 451 U. S. 477 (1981); *Michigan* v. *Mosley*, 423 U. S. 96, 110, n. 2 (1975) (WHITE, J., concurring in result); see also *ante*, at 350. But when that compulsion has been dispelled by the suspect's initiation of interrogation and voluntary waiver of his rights, there is no remaining Fifth Amendment objection to introduction at trial of a statement made outside the presence of counsel. See, *e. g.*, *Oregon* v. *Bradshaw*, 462 U. S. 1039 (1983).

The Sixth Amendment right to counsel[2] is much more pervasive because it affects the ability of the accused to assert any other rights he might have.[3] It is indisputable that the

---

[1] "No person shall be . . . compelled in any criminal case to be a witness against himself . . . ." U. S. Const., Amdt. 5.

[2] "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U. S. Const., Amdt. 6.

[3] "An accused's right to be represented by counsel is a fundamental component of our criminal justice system. Lawyers in criminal cases 'are necessities, not luxuries.' Their presence is essential because they are the

Amendment assures "'Assistance' at trial, when the accused [is] confronted with both the intricacies of the law and the advocacy of the public prosecutor." *United States* v. *Ash*, 413 U. S. 300, 309 (1973); see also *Perry* v. *Leeke*, 488 U. S. 272, 279 (1989); *United States* v. *Cronic*, 466 U. S. 648, 659, n. 25 (1984). That guarantee applies equally whether the defendant is presenting his case or the State is rebutting or impeaching the defendant's evidence. The State's interest in truthseeking is congruent with the defendant's interest in representation by counsel, for it is an elementary premise of our system of criminal justice "'that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.'" *Cronic*, 466 U. S., at 655 (quoting *Herring* v. *New York*, 422 U. S. 853, 862 (1975)); see also *Penson* v. *Ohio*, 488 U. S. 75, 84 (1988).

The accused's right to the assistance of counsel is not limited to participation in the trial itself. A defendant is entitled to the aid of his lawyer from the time of arraignment "when consultation, thoroughgoing investigation and preparation [are] vitally important," *Powell* v. *Alabama*, 287 U. S. 45, 57 (1932), through the time of first appeal. See *Penson*, 488 U. S., at 85; *Anders* v. *California*, 386 U. S. 738 (1967); *Douglas* v. *California*, 372 U. S. 353 (1963). Just as the Sixth Amendment's right to "the Assistance" of counsel necessarily encompasses a right to the effective assistance of counsel, see *Cronic*, 466 U. S., at 654–655; *Avery* v. *Alabama*, 308 U. S. 444, 446 (1940), so too the accused's right to have counsel "for his defence" in a "criminal prosecutio[n]" in-

---

means through which the other rights of the person on trial are secured. Without counsel, the right to a trial itself would be 'of little avail,' as this Court has recognized repeatedly. 'Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have.'" *United States* v. *Cronic*, 466 U. S. 648, 653–654 (1984) (footnotes omitted).

See also *Penson* v. *Ohio*, 488 U. S. 75, 84 (1988).

cludes the right to rely on counsel after the government's role has shifted from investigation to accusation and the "defendant finds himself faced with the prosecutorial forces of organized society." *Kirby* v. *Illinois*, 406 U. S. 682, 689 (1972) (opinion of Stewart, J.); see also *Moran* v. *Burbine*, 475 U. S. 412, 430 (1986).[4] Any lesser guarantee would provide insufficient protection against any attempt by the State to supplant "the public trial guaranteed by the Bill of Rights" with a "secret trial in the police precincts." *Spano* v. *New York*, 360 U. S. 315, 326 (1959) (Douglas, J., concurring).[5]

---

[4] The Court has recognized that the defendant has a right to counsel at a preliminary hearing where a plea is entered that may subsequently be introduced as evidence at trial, *White* v. *Maryland*, 373 U. S. 59 (1963), at a pretrial lineup, where counsel is necessary to "assure a meaningful confrontation at trial," *United States* v. *Wade*, 388 U. S. 218, 236 (1967), and during a pretrial interrogation when the State attempts to elicit information directly from the accused. *Brewer* v. *Williams*, 430 U. S. 387, 401 (1977); *id.*, at 415 (STEVENS, J., concurring). See also *Coleman* v. *Alabama*, 399 U. S. 1, 9 (1970); *Hamilton* v. *Alabama*, 368 U. S. 52 (1961). The Court has also applied the Sixth Amendment's protection to surreptitious government attempts to deliberately elicit information from the indicted defendant. See *Maine* v. *Moulton*, 474 U. S. 159 (1985); *United States* v. *Henry*, 447 U. S. 264 (1980); *Massiah* v. *United States*, 377 U. S. 201 (1964).

[5] The application of the Sixth Amendment guarantee to these pretrial events constitutes simple recognition that under the modern system of law enforcement and public prosecution, the "criminal prosecution" to which the Sixth Amendment refers begins when formal charges are filed. As we explained in *United States* v. *Wade*, 388 U. S., at 224:

"When the Bill of Rights was adopted, there were no organized police forces as we know them today. The accused confronted the prosecutor and the witnesses against him, and the evidence was marshalled, largely at the trial itself. In contrast, today's law enforcement machinery involves critical confrontations of the accused by the prosecution at pretrial proceedings where the results might well settle the accused's fate and reduce the trial itself to a mere formality. In recognition of these realities of modern criminal prosecution, our cases have construed the Sixth Amendment guarantee to apply to 'critical' stages of the proceedings." (Footnote omitted.)

See also *United States* v. *Ash*, 413 U. S. 300, 310–311 (1973).

The Court correctly explains that *Jackson* was based in part on Fifth Amendment concerns extending "the *Edwards* protections" to the situation "when a suspect charged with a crime requests counsel outside the context of interrogation." *Ante,* at 350. However, that was not the whole of our opinion. *Jackson* is also firmly and explicitly rooted in our Sixth Amendment decisions holding that an indicted defendant has the "right to rely on counsel as a 'medium' between him and the State" whenever the State attempts to deliberately elicit information from him. See *Maine* v. *Moulton,* 474 U. S., at 176; *Brewer* v. *Williams,* 430 U. S. 387 (1977); *United States* v. *Henry,* 447 U. S. 264 (1980); *Massiah* v. *United States,* 377 U. S. 201 (1964). *Jackson* made clear that that right applied to the State's initial question whether the defendant would like to waive his constitutional rights as well as to any subsequent questions asking for particular incriminating information. 475 U. S., at 632.[6] The defendant may waive the right to be free from direct state communication by initiating contact with the State. But if the State initiates communication with a represented defendant outside the presence of counsel any subsequent waiver of the right to rely on counsel is not just "presumed invalid," *ante,* at 349; it "*is* invalid." *Jackson,* 475 U. S., at 636 (emphasis added). Preventing the State from directly contacting a represented defendant thus does not, as the Court states, "'imprison a man in his privileges,'" *ante,* at 353 (quoting *Adams* v. *United States ex rel. McCann,* 317 U. S. 269, 280 (1942)); it simply recognizes and gives respect to the defendant's previously invoked choice to communicate with the State only through counsel. As JUSTICE WHITE explained for the

---

[6] Indeed, we expressly foreshadowed the result in *Jackson,* and its grounding on the Sixth Amendment protection of the attorney-client relationship when we stated in *Maine* v. *Moulton,* 474 U. S., at 178, n. 14, that the defendant's right to counsel "was violated as soon as the State's agent engaged Moulton in conversation about the charges pending against him" without counsel being present.

Court in *Patterson* v. *Illinois*, while "an accused [can make] an *initial* election as to whether he will face the State's officers during questioning with the aid of counsel, or go it alone," "the essence" of *Jackson* and our earlier decision in *Edwards* v. *Arizona*, 451 U. S. 477 (1981), is "[p]reserving the integrity of an accused's choice to communicate with the police only through counsel." 487 U. S., at 291. Indeed, we expressly noted, in explaining why an unrepresented defendant could waive his Sixth Amendment rights without counsel being present, that "[o]nce an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect." *Id.*, at 290, n. 3.

The right to consult with counsel prior to the commencement of an interrogation, moreover, cannot be limited to those interrogations that produce evidence for use in the State's case in chief. The interests of the defendant in the assistance of counsel in his confrontation with the prosecutorial forces of organized society extend to all efforts to elicit information from the defendant whether for use as impeachment or rebuttal at trial or simply to formulate trial strategy. Cf. *Weatherford* v. *Bursey*, 429 U. S. 545, 552, 554 (1977); *Wyrick* v. *Fields*, 459 U. S. 42, 54 (1982) (MARSHALL, J., dissenting). Under *Estelle* v. *Smith*, 451 U. S. 454, 469–471 (1981), for example, psychiatric evidence taken from a represented defendant without notice to counsel may not be introduced at the sentencing phase of a capital trial even when, under Fifth Amendment standards, the evidence is otherwise admissible. See *Powell* v. *Texas*, 492 U. S. 680, 681 (1989). Whether or not the accused has a right to have counsel present during a psychiatric examination, it is clear that there is a Sixth Amendment right to consult with counsel prior to submitting to the examination. 451 U. S., at 471; see also *Satterwhite* v. *Texas*, 486 U. S. 249, 254 (1988). Those concerns are not limited to the capital sentencing context. In *Buchanan* v. *Kentucky*, 483 U. S. 402 (1987), the Court unan-

imously agreed that *Estelle* was applicable to the use of psychiatric evidence as rebuttal during the guilt stage of a noncapital trial, holding that before the State initiates a psychiatric examination of a defendant, defense counsel must be informed "about the scope and nature of the proceeding." 483 U. S., at 424; see also *id.*, at 425, n. 21; *id.*, at 433–434 (MARSHALL, J., dissenting). After the right to counsel has been implemented, the State may not short-circuit the adversarial system by confronting the defendant behind counsel's back. In this case, there should be no equivocation about the conclusion that the State violated the Sixth Amendment when it initiated a private interview with respondent outside the presence of counsel and used the products of the interview as impeachment at trial.

## II

Instead of acknowledging that the facts describe a plain violation of respondent's Sixth Amendment right, the Court elides the issue by recharacterizing it as involving nothing more than the violation of a "prophylactic" rule. The purpose of this recharacterization is to enable the Court to draw an analogy to cases like *Walder* v. *United States*, 347 U. S. 62, 65 (1954), *Harris* v. *New York*, 401 U. S. 222 (1971), *Oregon* v. *Hass*, 420 U. S. 714 (1975), and *United States* v. *Havens*, 446 U. S. 620, 626 (1980), in which the Court held that the interests in deterring violations of *Miranda* and the Fourth Amendment were adequately served by excluding the illegally obtained evidence from the prosecutor's case in chief. The Court's analysis, however, simply ignores the reasons why evidence that is taken from an indicted defendant outside the presence of counsel is excluded from trial.

The Court has held that evidence seized in violation of the Fourth Amendment is excluded from a criminal trial not as a personal right of the criminal defendant but rather as a remedy for a wrong that is fully accomplished at the time the evidence is obtained. See, *e. g., Stone* v. *Powell*, 428 U. S. 465, 486 (1976); *United States* v. *Calandra*, 414 U. S. 338,

348 (1974). Thus it is that evidence that is the product of an unreasonable search or seizure may nonetheless be introduced for impeachment purposes. Since its introduction causes no independent constitutional harm, the Court has reasoned that use of illegally obtained evidence for impeachment is not objectionable as long as the general efficacy of the exclusionary rule in deterring future violations of the Fourth Amendment is not thereby impaired. See *Havens*, 446 U. S., at 627–628.

A similar approach has characterized the Court's analysis of introduction of statements taken in violation of a defendant's rights under *Miranda* v. *Arizona*, 384 U. S. 436 (1966). The Court has held that *Miranda* establishes a prophylactic rule that "sweeps more broadly than the Fifth Amendment itself." *Oregon* v. *Elstad*, 470 U. S. 298, 306 (1985); see *New York* v. *Quarles*, 467 U. S. 649, 654 (1984); *Michigan* v. *Tucker*, 417 U. S. 433, 444 (1974). Unwarned statements or statements improperly taken after the invocation of the right to counsel or the right to remain silent, such as respondent's statement here, must be excluded from the State's case in chief to ensure compliance with *Miranda*'s dictates. But as long as the statement is not unconstitutionally coerced or involuntary, see *New Jersey* v. *Portash*, 440 U. S. 450 (1979); *Mincey* v. *Arizona*, 437 U. S. 385, 398 (1978), and its limited use would not eviscerate the deterrent effect of the exclusionary rule, the Court has held that it can be admitted for impeachment purposes. See *Oregon* v. *Hass*, 420 U. S. 714 (1975); *Harris* v. *New York*, 401 U. S. 222 (1971).

The same is not so with respect to the Sixth Amendment. The exclusion of statements made by a represented and indicted defendant outside the presence of counsel follows not as a remedy for a violation that has preceded trial but as a necessary incident of the constitutional right itself.[7]

---

[7] As Professor Schulhofer has commented:

"[T]he *Massiah* 'exclusionary rule' is not merely a prophylactic device; it is not designed to reduce the *risk* of actual constitutional violations and is not

"[T]he Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial." *Strickland* v. *Washington*, 466 U. S. 668, 684 (1984). It is not implicated, as a general matter, in the absence of some effect of the challenged conduct on the trial process itself. See *United States* v. *Cronic*, 466 U. S., at 658; *Weatherford* v. *Bursey*, 429 U. S., at 558; see also *Nix* v. *Williams*, 467 U. S. 431, 456 (1984) (STEVENS, J., concurring in judgment). It is thus the use of the evidence for trial, not the method of its collection prior to trial, that is the gravamen of the Sixth Amendment claim. Although the defendant may not be entitled to a remedy in the form of reversal of the conviction if the evidence is harmless, that conclusion does not alter the fact that admission of the evidence is itself error. As we explained in *Massiah*, even when police investigation of a defendant may be "entirely proper," a defendant is "denied the basic protections of [the Sixth Amendment] guarantee when there [is] used against him at his trial evidence of his own incriminating words, which federal agents . . . deliberately elicited from him after he had been indicted and in the absence of his counsel." 377 U. S., at 206–207. See also *Maine* v. *Moulton*, 474 U. S., at 178–180. There is no reason why that rule should not apply here.

---

intended to deter any pretrial behavior whatsoever. Rather, *Massiah* explicitly permits government efforts to obtain information from an indicted suspect, so long as that information is not used 'as evidence against *him* at his trial.' The failure to exclude evidence, therefore, cannot be considered *collateral* to some more fundamental violation. Instead it is the admission at trial that in itself denies the constitutional right." Confessions and the Court, 79 Mich. L. Rev. 865, 889 (1981) (footnote omitted).

See also Loewy, Police-Obtained Evidence and the Constitution: Distinguishing Unconstitutionally Obtained Evidence from Unconstitutionally Used Evidence, 87 Mich. L. Rev. 907, 931 (1989) ("The justification for disallowing such evidence would not be the 'exclusionary rule,' but the sixth amendment's rules governing fair trials"); Wasserstrom & Mertens, The Exclusionary Rule on the Scaffold: But Was it a Fair Trial?, 22 Am. Crim. L. Rev. 85, 175 (1984).

The Court contents itself with the statement, drawn from *Oregon* v. *Hass, supra,* that there is only a "speculative possibility" that the State would be deterred from conducting a private interview with a represented defendant by a rule that excludes its product from use as impeachment at trial. *Ante,* at 351–352. Aside from the fact that the Court's assurance will provide scant comfort to the defendant, such as respondent, whose statement is admitted at trial, it is perfectly clear that the balance struck in *Hass* would not prevent the unlawful police and prosecutorial conduct here. The police misconduct in *Walder, Harris, Havens,* and *Hass* all occurred before the defendant had been formally charged, when the unsolved crime was still being investigated and the questioning of a suspect might be expected to produce evidence that is necessary to obtain an indictment. Knowledge that the improper conduct of an interrogation will destroy its use as substantive evidence provides a powerful incentive to follow the dictates of *Miranda* and its progeny with great care.

Once a defendant is formally charged with an offense, however, the State is no longer merely engaged in the task of determining who committed an unsolved crime; rather, it is preparing to convict the defendant of the crime he allegedly committed. "[T]he government's role shifts from investigation to accusation." *Moran* v. *Burbine,* 475 U. S., at 430. The State has obtained sufficient evidence to establish probable cause, see *Patterson* v. *Illinois,* 487 U. S., at 306 (STEVENS, J., dissenting), and the ethical prosecutor has sufficient admissible evidence to convict.[8] In practice, the in-

---

[8] See ABA Standards for Criminal Justice 3–3.9(a) (2d ed. 1980) ("It is unprofessional conduct for a prosecutor to institute, or cause to be instituted, or to permit the continued pendency of criminal charges when it is known that the charges are not supported by probable cause. A prosecutor should not institute, cause to be instituted, or permit the continued pendency of criminal charges in the absence of sufficient admissible evidence to support a conviction").

vestigation is often virtually complete.[9]   Any subsequent investigation is a form of discovery.[10]   The cost of an illegal interrogation is therefore greatly reduced.   The police would have everything to gain and nothing to lose by repeatedly visiting with the defendant and seeking to elicit as many comments as possible about the pending trial.   Knowledge that such conversations could not be used affirmatively would not detract from the State's interest in obtaining them for their value as impeachment evidence.[11]

## III

In my dissenting opinion in *Patterson* v. *Illinois*, 487 U. S., at 301–302, I expressed my concern about the Court's condonation of unethical forms of trial preparation.[12]   I un-

---

[9] Most of the evidence used in criminal prosecutions is compiled shortly after the offense and prior to the indictment.   See *id.*, at 11·43 ("Normally, prosecutorial investigation will have been completed prior to the filing of the accusatory instrument"); L. Weinreb, Denial of Justice 47 (1977); Kaplan, The Prosecutorial Discretion—A Comment, 60 Nw. U. L. Rev. 174, 180 (1965).

[10] "The work of the agents was trial preparation, pure and simple.   In a civil context I would consider this behavior unethical and unfair.   In a criminal context I regard it as such a departure from 'procedural regularity' as to violate the due process clause of the Fifth Amendment." *United States* v. *Springer*, 460 F. 2d 1344, 1355 (CA7) (dissenting opinion) (footnote omitted), cert. denied, 409 U. S. 873 (1972).

[11] Moreover, the Court should not ignore the fact that its holding will inevitably discriminate against defendants who are too indigent to post bond.   Those who are not held in custody after the attorney-client relationship has been formed are not exposed to daily contact with the police and therefore have little stake in the rule announced in this case.   Because the indigent defendant has only occasional contact with his lawyer but is under the constant control of the prosecutor, it is he whose interests are most affected by the Court's ruling.   The Court should at least pause before adopting a rule that can have such an obviously disparate impact on indigent defendants.

[12] "The Court should not condone unethical forms of trial preparation by prosecutors or their investigators.   In civil litigation it is improper for a lawyer to communicate with his or her adversary's client without either notice to opposing counsel or the permission of the court.   An attempt to ob-

successfully argued that private interviews with a defendant conducted by the prosecutor for the purpose of obtaining evidence to be used against him at trial were so manifestly unfair that the practice should be flatly prohibited at any time after formal proceedings begin and the Sixth Amendment right attaches. The Court rejected my argument and held that a properly advised defendant whose right to counsel has not been implemented can validly waive his right to counsel after *Miranda* warnings have been administered. In explaining that holding, the Court recognized that the waiver issue cannot be resolved without "asking what purposes a lawyer can serve at the particular stage of the proceedings in question, and what assistance he could provide to an accused at that stage." 487 U. S., at 298. The Court identified the

---

tain evidence for use at trial by going behind the back of one's adversary would be not only a serious breach of professional ethics but also a manifestly unfair form of trial practice. In the criminal context, the same ethical rules apply and, in my opinion, notions of fairness that are at least as demanding should also be enforced.

"After a jury has been impaneled and a criminal trial is in progress, it would obviously be improper for the prosecutor to conduct a private interview with the defendant for the purpose of obtaining evidence to be used against him at trial. By 'private interview' I mean, of course, an interview initiated by the prosecutor, or his or her agents, without notice to the defendant's lawyer and without the permission of the court." (Footnotes omitted.)

As a matter of ethics, the conduct of the officer here was plainly improper. Under the Michigan Rules of Professional Conduct, as under the ABA's Code of Professional Responsibility, a prosecutor may not talk to the defendant without first giving notice to his opposing counsel. See Mich. Rules of Professional Conduct, Rule 4.2 (1989); ABA Model Code of Professional Responsibility DR 7–104(A)(1) (1980). That ethical restraint also applies to agents of the prosecutor. See Mich. Rules of Professional Conduct, Rule 5.3 (1989); see also Tr. of Oral Arg. 11–12. Indeed, the House of Delegates of the American Bar Association has recently stressed that the requirements of DR 7–104(A)(1) are applicable to government prosecutors. ABA House of Delegates Report No. 301 (approved Feb. 12–13, 1990).

constitutional right as a "spectrum" with minimal protection at one extreme and the maximum at the other.

"At the other extreme, recognizing the enormous importance and role that an attorney plays at a criminal trial, we have imposed the most rigorous restrictions on the information that must be conveyed to a defendant, and the procedures that must be observed, before permitting him to waive his right to counsel at trial. See *Faretta* v. *California*, 422 U. S. 806, 835–836 (1975); cf. *Von Moltke* v. *Gillies*, 332 U. S. 708, 723–724 (1948). In these extreme cases, and in others that fall between these two poles, we have defined the scope of the right to counsel by a pragmatic assessment of the usefulness of counsel to the accused at the particular proceeding, and the dangers to the accused of proceeding without counsel." *Ibid.*

In this case the Court has nothing to say about the point on this spectrum at which the interview with respondent took place and the standards that would be sufficient to establish a waiver of the Sixth Amendment right. At the outset, the Court seems to hold that impeachment is always permissible,[13] but in the end, after acknowledging that analysis of the waiver issue changes when a defendant obtains or requests counsel, *ante*, at 352, the Court simply asserts that the defendant must make "a knowing and voluntary waiver of the right to counsel." *Ante*, at 354.[14] The interview at issue in this case occurred after the right to counsel had been implemented, when respondent had been in custody for over two months and was to be tried in only a few days. Although the

---

[13] "The question presented in this case is whether the prosecution may use a statement taken in violation of the *Jackson* prophylactic rule to impeach a defendant's false or inconsistent testimony. We hold that it may do so." *Ante*, at 345–346.

[14] "[W]e need not consider the admissibility for impeachment purposes of a voluntary statement obtained in the absence of a knowing and voluntary waiver of the right to counsel."

interview was conducted by a police officer rather than a law-yer, it was in many respects comparable to a pretrial deposition. The value of representation by counsel is evident. If respondent had been properly advised by counsel in preparation for such a deposition, he would have reviewed all of the facts he intended to describe in his trial testimony and been counseled not to omit any significant details, including presumably the three whose omission the State made use of as impeachment here.[15] Interrogation outside the presence of counsel at this advanced stage of the proceedings can impair counsel's representation of his client and interfere with trial strategy.

Regardless of whether or not the Court is prepared to accept a finding that respondent's participation in such a pretrial deposition was "voluntary"—as measured by some undisclosed standard—it surely denigrates the value of the constitutional interest in the assistance of counsel to condone such a shabby practice.

## IV

Apparently as a means of identifying rules that it disfavors, the Court repeatedly uses the term "prophylactic rule." See *ante*, at 345, 349, 350, 351, and 353. It is important to remember, however, that all rules of law are prophy-

---

[15] As the Court acknowledges, *ante*, at 347, and n. 2, the entire basis for the prosecutor's attempt to impeach respondent rested upon his failure to mention three details at his deposition. Respondent testified that he and the victim had smoked cocaine in the victim's house on the night of the incident and that another man and woman had been present during part of the time. App. 5–6. He testified at trial that he did not know the man's name, *id.*, at 36, but in the statement he had indicated that he "thought" his name was "Michael." *Id.*, at 37. Moreover, he also testified that this other man "had some caine, too, and he was smoking his. So we were like exchanging." *Id.*, at 39. But the statement had only mentioned cocaine that respondent had provided. *Ibid.* Finally, although respondent testified that he pushed the victim away after she threatened him with a fork, he neglected to mention during his deposition that he wrested the fork from her and threw it to the floor. *Id.*, at 44.

lactic. Speed limits are an example; they are designed to prevent accidents. The Sixth Amendment is another; it is designed to prevent unfair trials. An argument that a rule of law may be ignored, avoided, or manipulated simply because it is "prophylactic" is nothing more than an argument against the rule of law itself. The tragedy of today's decision is not merely its denigration of the constitutional right at stake; it also undermines the principle that those who are entrusted with the power of government have the same duty to respect and obey the law as the ordinary citizen.

I respectfully dissent.