RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0139p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          *v.*

TOBIAS F. AGUIRRE,
          *Defendant-Appellant.*

> No. 08-5477

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 06-00076-002—J. Ronnie Greer, District Judge.

Argued: April 29, 2010

Decided and Filed: May 17, 2010

Before: COOK and McKEAGUE, Circuit Judges; HOOD, District Judge.[*]

_____

## COUNSEL

**ARGUED:** J. Patten Brown, III, LAW OFFICES OF PAT BROWN, Hartford, Connecticut, for Appellant. Debra A. Breneman, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee. **ON BRIEF:** J. Patten Brown, III, LAW OFFICES OF PAT BROWN, Hartford, Connecticut, for Appellant. David C. Jennings, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee.

_____

## OPINION

_____

McKEAGUE, Circuit Judge. Defendant Tobias Aguirre was convicted by a jury of possession with the intent to distribute a quantity of cocaine, and with the possession

_____

[*] The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

of firearms in furtherance of a drug trafficking offense. In order to have counsel appointed, Aguirre filed a financial affidavit. On redirect examination, the government moved to admit Aguirre's financial affidavit to provide some evidence of Aguirre's guilt. The district court admitted the financial affidavit. We find that the district court erred in admitting the financial affidavit but that it was not plain error and, therefore, **AFFIRM** Aguirre's convictions.

## I. BACKGROUND

In the summer of 2006, Morristown Police Detective Michael Hurt began investigating the drug trafficking activities of Alfonzo Rojas. Rojas had two businesses in Morristown: a junkyard called "G&G Auto Parts" and a body shop on Main Street.

On July 11, 2006, Officer Hunt arranged to have Solomon purchase three ounces of crack cocaine from Rojas. Solomon made a recorded telephone call to Rojas, who agreed to meet her at the junkyard. Solomon was provided with $2,550 to purchase the crack cocaine and equipped with a listening device and a digital recorder so that agents could listen to the conversation. Officers followed Solomon to the junkyard and parked an eighth of a mile away. Because of the junkyard's location, the officers were not able to conduct visual surveillance of the transaction.

Rojas did not have the drugs with him when Solomon arrived and, according to Officer Hunt, Solomon waited approximately two and a half hours for the crack cocaine to be delivered. When the drugs arrived, Solomon advised the officers that the person who delivered the drugs would be leaving in a late 90's Jeep. Officer Hurt observed the jeep drive past, but he could not follow it without being noticed by the driver and, from his position, he could not tell who was driving the jeep. Solomon testified that Aguirre delivered the crack to Rojas.[1]

---

[1] At sentencing, the district court "simply refuse[d] to credit Ms. Solomon's testimony" and noted that "[c]learly the jury did not credit Ms. Solomon's testimony, nor did the jury find the corroboration of her testimony sufficient to find beyond a reasonable doubt that Mr. Aguirre had committed the offenses charged in Count 5, 6, and 7." (R. 95 Sentencing 14-15.) Solomon testified that she had previously given false information under oath at trial.

After this first transaction, Solomon began working for Rojas at the junkyard. She called Officer Hurt one day and told him that the man who had delivered the drugs on July 11, 2006 was leaving the junkyard driving a gray S-10 Chevy pickup truck. Officer Hurt immediately called an officer on duty in a marked cruiser, who effected a traffic stop. During the stop, Officer Hurt photographed the driver. The photos, which were admitted into evidence, showed Aguirre.

On another day, Solomon told Officer Hurt that Aguirre would be at the body shop. Aguirre was driving a bright blue S-10 pickup truck. After Aguirre left the body shop, officers followed him to a double-wide trailer at Wilburn Avenue (the "Wilburn residence") and observed him go up to the front door and use a key to open the residence, which he then entered.

On October 24, 2006 Officer Hunt met with Solomon and had her place a recorded phone call to Rojas for an ounce of crack cocaine. She was provided with $900 to make the purchase and fitted with recording equipment. Officers video-taped the transaction. After Solomon arrived at the body shop to pick up the drugs she had ordered, Aguirre arrived in a bright blue S-10 pickup truck, exited the vehicle, and entered the shop. Solomon was initially waiting out in the van. A few minutes later, Aguirre and Rojas exited the office, Rojas patted Aguirre on the back, and Aguirre left. Rojas then went over to Solomon, and Solomon walked into the office. Rojas picked up a box and followed her in, and soon Solomon exited the office, got into her van, and met with the officers. She disclosed that Rojas had sold her powder cocaine instead of crack cocaine and, consequently, that it had cost $50 less than expected. After Aguirre left the body shop, followed by officers, he drove straight to the Wilburn residence.

On October 26, 2006 the officers obtained a search warrant for the Wilburn residence and arranged for Solomon to purchase another three ounces of crack from Rojas. Officers were observing the Wilburn residence when Solomon called Rojas, and these officers were informed of the time of Solomon's call. Shortly after the call, officers observed Aguirre leaving the Wilburn residence, and they followed him straight to Rojas's body shop. Officer Hurt observed and videotaped the transaction at the body

shop.  Solomon was the first to arrive at the body shop, and she had exited her vehicle and was standing in the parking lot when Aguirre arrived.  After he arrived, Aguirre walked toward the body shop's garage.  Rojas then arrived and, after Aguirre and Solomon relocated their vehicles, Rojas met with Solomon and a drug transaction occurred.  Solomon then left, and officers retrieved the crack cocaine Rojas had sold her.  Aguirre was arrested while he was still at the body shop; he did not have any drugs or money on him.

The officers then went to the Wilburn residence and executed their search warrant. No one was present.  When they entered, they observed a picture of Aguirre and a female hanging above the televison, and they found male and female clothing and personal belongings, as well as the belongings of a child.  In the house, the officers found two handguns, approximately a quarter kilogram of powered cocaine, and approximately seven grams of crack cocaine.  One of the handguns was found with a loaded clip.  The officers found a wrapper that, based on their experience, they believed had previously contained a kilogram brick of cocaine; the inside of the wrapper was covered with a white residue.  The officers found large scales in the kitchen pantry that could be used for weighing drugs and a dietary supplement that is used as a cutting agent with cocaine.  There was a stainless steel pot on a stove with a white ring inside of it, which was consistent with cooking crack cocaine.  The officers also found a shaving kit which contained multiple rounds of ammunition and $8,020 in cash.

At his initial appearance following his arrest, Aguirre executed a financial affidavit showing indigency, and counsel was appointed to represent him.  Aguirre proceeded to jury trial on October 17, 2007 and was found guilty of: (Count Eight) aiding and abetting with Rojas to distribute a quantity of a mixture and a substance containing a detectable amount of cocaine hydrochloride on October 26, 2006 and (Count Nine) possessing firearms in furtherance of a drug trafficking crime.  He was sentenced to 138 months of imprisonment.

### 1. *The financial affidavit*

At trial, during the cross examination of the government's witness, Officer Hurt, defense counsel asked a series of questions about the money found during the search of the Wilburn residence:

> [**Counsel**]: Now, you, you made mention that there was some money, I think you said $8,020 located in, I believe you said it was either a shaving kit or a doc kit, a man's toiletry kit is the impression I got?
>
> [**Officer**]: Correct.
>
> [**Counsel**]: And, of course, Hispanic folks have difficulty, they can't get a bank account, since 911 they can't get a bank account, nobody can get a bank account if they don't have a social security number; right?
>
> [**Officer**]: I wouldn't know.
>
> [**Counsel**]: Okay, and not uncommon for folks who can't get a bank account to keep money at home; right?
>
> [**Officer**]: If they don't have a bank account, they could probably get --
>
> [**Counsel**]: They can't keep it in a bank; can they?

(R. 94 Hurt 18-19.) Through this line of questioning defense counsel suggested a non-drug related explanation for the large quantity of cash found in the Wilburn residence. In response, on redirect examination, the following exchange took place, which led to the admission of Exhibit 22:

> [**AUSA**]: Do you know whether [Aguirre] has a bank account or not, the defendant?
>
> [**Officer**]: I do not.
>
> [**AUSA**]: Do you know of any employment he had at the time you arrested him?
>
> [**Officer**]: No.
>
> [**AUSA**]: Your honor, at this time I would ask that a court document from the court file in  this case be marked as an exhibit and introduced into evidence, a financial affidavit for the Defendant.
>
> [**Court**]: Has [defense counsel] seen this?

[**AUSA**]:  I'm sure she has.  The defendant --

[**Counsel**]:  Your Honor, I was not involved, I was not involved in this matter at this time, so I don't really know the circumstances by which this came about.

[**Court**]:  Let me see the document.

[**AUSA**]:   Offered for the indication of the first question on that document,[2] your Honor.

[**Court**]: I think it's admissible.  Let's mark it as Exhibit 22, and it may be displayed to the jury.

(R. 94 Trans. 27-28.)  After it was admitted, the document was used as evidence that the Defendant was unemployed and therefore, to suggest that the large quantity of cash did not have a legitimate source and, consequently, that it was a part of his illegal drug-trafficking activities.

Similarly, during closing arguments, the government argued:

What else do you have that should convince you that this guy is a drug dealer? $8,020 in cash, rubber banded, hidden in a shaving kit in the top of his master bedroom closet.  Ms. Stapleton suggested, well, you know, hard for Hispanics to have bank accounts.  Well, if you look at Exhibit 22, his financial affidavit, first of all, we see he's unemployed, so how has he got $8,020 in his house if he's not got a job?  Then she suggested in her cross examination of Detective Hurt, well, it's not even his house, some other guy owns the house.  See at the bottom of his financial affidavit that bears his signature, $450 a month for rent.  With all due respect to Ms. Stapleton, that's a smoke screen.  He rents the house.  You think not his house?  His picture is hanging on the wall in the living room, a picture of him.  He lives there with this young lady back there.  There should be no doubt in your mind that's his house.

(R. 94 at 128-29.).

---

[2]The first question on the document asked, "are you now employed?"  In response Aguirre had checked the "No" box.

## II. ANALYSIS

The Sixth Amendment guarantees indigent criminal defendants the right to counsel. However, the burden is on the defendant to come forward with evidence to prove his indigency. *United States v. Krzyske*, 836 F.2d 1013, 1018-1019 (6th Cir. 1998). In *Krzyske*, this court found that "it was not error for the district court to find no indigency where the defendant declined to supply additional information to the court unless the proceedings were held in camera and without the government's participation." 513 F.3d at 1018-19; *but see United States v. Gravatt*, 868 F.2d 585, 589 (3d Cir. 1989) (finding that this protection may be offered before trial). Instead, "[t]he time for protection will come when, if ever, the government attempts to use the information [used to prove indigency] against the defendant at trial. We are not willing to assume that the government will make such use, or if it does, that a court will allow it to do so." 513 F.3d at 1018 (quoting *United States v. Peister*, 631 F.2d 658, 662 (10th Cir. 1980)). Therefore, under *Krzyske*, the time to resolve the tension between the defendant's Fifth and Sixth amendment rights is, as in this case, when the government introduces at trial incriminating information obtained purely from the defendant's financial disclosures provided to obtain counsel.

### 1. The failure to object

The district court did not make a ruling because defense counsel failed to object; consequently, we review for plain error. *United States v. Benson*, 591 F.3d 491, 501 (6th Cir. 2010) ("When, as here, a party does not timely raise an issue in district court or make an objection, an objection to the error is deemed forfeited and reviewed only for plain error."). Aguirre offers several reasons why his attorney's failure to object can be excused. However, while we recognize that defense counsel encountered a difficult situation, it does not excuse her failure to object.

Aguirre argues that, "[i]t is clear from the colloquy previously discussed surrounding the admission of [the financial affidavit], that the court and all Counsel

treated this as an objection." (Appellant Br. 13.)**³** We are not persuaded. Aguirre's counsel did not actually object, but instead remarked that she did not know what was going on. The responsibility to object, to ask for more time, or to ask for an opportunity to review the proffered document is on defense counsel. Certainly, the district court could have asked defense counsel if she had any objections or given her more time to consider the financial affidavit. But, it was defense counsel's task to request more time or to make an objection. Since she did not, we review for plain error.

### 2. *Plain error review*

To find plain error, we must find that: (1) there was "an error or defect – some sort of '[d]eviation from a legal rule' – that has not been intentionally relinquished or abandoned, *i.e.*, affirmatively waived, by the appellant"; (2) the legal error was "clear or obvious, rather than subject to reasonable dispute"; (3) the error "affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it 'affected the outcome of the district court proceedings.'" *Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009). Finally, "if the above three prongs are satisfied" this court "has the *discretion* to remedy the error – discretion which ought to be exercised only if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (emphasis in the original); *United States v. Mayberry*, 540 F.3d 506, 512 (6th Cir. 2008).

---

**³**Aguirre makes several additional arguments that we find unpersuasive. First, he argues that, although FED R. EVID.103(a) requires an objection, it also "states that a party need not renew an objection or offer of proof once the court has made a 'definitive ruling.'" (Appellant Br. 13.) However, the fact that a party does not need to renew an objection after a definitive ruling has been issued does not negate the initial requirement that the party object, so that the court can make a definitive ruling on that objection. Second, Aguirre asks us to read this exchange in the context of FED R. CIV. P. 51(a), but Rule 51(a) deals with jury instructions and does not seem to have any bearing on this issue. Third, Aguirre argues that the district court used its discretion under FED. R. EVID. 103(b) as a "form of making a record of the basis for admissibility and objections" and, consequently, that the district court "negated the need for an objection." (Appellant Br. 13.) However FED. R. EVID. 103(b) states that: "The court may add any other or further statement which shows the character of the evidence, the form in which it was offered, the objection made, and the ruling thereon. It may direct the making of an offer in question and answer form." Thus, Rule 103(b) is discretionary and does not negate defense counsel's responsibility for objecting. Here, the constitutional violation simply was not addressed and it was ultimately defense counsel's responsibility to object on the proper grounds.

### 3. *Admission of the financial affidavit*

The Supreme Court has not decided whether the use of information provided to assert a defendant's Sixth Amendment right to counsel may be used against him as substantive evidence of guilt. *See United States v. Kahan*, 415 U.S. 239, 243 (1974) (specifically declining to decide whether "the Simmons principle" could be "appropriately extended to Sixth Amendment claims for appointed counsel"). In *Simmons*, the Court examined the interaction between the defendant's right to assert an objection against an unreasonable search and seizure under the Fourth Amendment and the defendant's Fifth Amendment right against self-incrimination. *Simmons v. United States*, 390 U.S. 377, 387-94 (1968). The trial court in that case had allowed the government to use testimony, given by the defendant in an unsuccessful attempt to suppress evidence under the Fourth Amendment, against the defendant at trial on the issue of guilt. *Id.* The *Simmons* Court found that forcing the defendant to choose between his Fourth and Fifth Amendment rights created an "undeniable tension" and that a defendant should not be "obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination." *Id.* at 394. Consequently, the Court held that "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." *Id.*[4]

---

[4]In *Michigan v. Harvey*, the Supreme Court allowed the government to impeach the defendant at trial with evidence obtained in violation of the prophylactic Sixth Amendment rule articulated in *Michigan v. Jackson*, 475 U.S. 625 (1990), (because a colloquy between the defendant and the police officer, which was used for impeachment, could not be viewed as defendant-initiated interrogation). 494 U.S. 344, 344-355 (1990). However, *Harvey* is distinguishable from this case. First, it dealt with a prophylactic Sixth Amendment rule, whereas the provision of financial information is a necessary prerequisite to Aguirre's exercise of his Sixth Amendment rights. Furthermore, Aguirre did not testify in this case and there is no indication that the information that he offered in his financial affidavit was false. The veracity of Aguirre's statements is important because, in *Kahan*, the Supreme Court found that false statements made to show indigency and obtain counsel under the Sixth Amendment could be admitted:

> The truth of the matter was that respondent was not indigent, and did not have a right to appointment of counsel under the Sixth Amendment. We are not dealing, as was the Court in *Simmons*, with what was 'believed' by the claimant to be a 'valid' constitutional claim . . . . Respondent was not, therefore, faced with the type of intolerable choice *Simmons* sought to relieve. The protective shield of *Simmons* is not to be converted into a license for false representations on the issue of indigency free from the risk that the claimant will be held accountable for his falsehood.

To summarize, the defendant has a right to counsel if he can demonstrate financial inability. Demonstrating financial inability may require the disclosure of information. If truthful, this information disclosed to demonstrate financial inability should not be admitted against defendant at trial on the issue of guilt because to do so would force a defendant to choose between his Sixth Amendment right to counsel and his Fifth Amendment right against self incrimination. Therefore, we hold that, if the defendant has disclosed truthful information to demonstrate financial inability and obtain counsel under the Sixth Amendment, that information may not thereafter be admitted against him at trial on the issue of guilt. In this case, the information disclosed by Aguirre in his financial affidavit was disclosed in order to obtain counsel. The information was used by the Government against Aguirre at trial on the issue of guilt. Consequently, the district court erred in admitting the financial affidavit at trial.[5]

### 4. *Not reversible error*

However, even though the district court erred in admitting the financial affidavit, the error was not plain. The financial affidavit was used briefly on redirect and at closing. On redirect, the prosecution used it to show that, contrary to defense counsel's assertions, it was unusual for even an illegal immigrant to have over $8,000 in cash in his apartment because Aguirre was unemployed. At closing, the government also argued that, since the financial affidavit showed that Aguirre was unemployed, this suggested that the $8,020 found in his house came from illegal sources. Furthermore, the

---

415 U.S. at 243.

[5] Other circuits that have considered this issue have agreed. *See United States v. Hardwell*, 80 F.3d 1471, 1484 (10th Cir. 1996) (finding plain error after the government used the defendant's "financial affidavit and other statements he made to establish eligibility for appointed counsel to prove guilt at trial" because the "conflict between Fifth and Sixth Amendment rights [wa]s not speculative"); *United States v. Branker*, 418 F.2d 378, 380-81 (2d Cir. 1969) ("[T]he government should not be permitted to use as part of its direct case any testimony given by a defendant at a hearing where he is seeking . . . the assignment of counsel on the ground of his financial inability . . . to secure counsel. The defendant should enjoy his constitutional rights to counsel . . . without running the risk that thereby he may be incriminating himself with respect to the charges pending against him."); *United States v. Anderson*, 567 F.2d 839, 840-41 (8th Cir. 1977) (noting that financial data provided to show indigency in order to be entitled to the appointment of counsel under the Sixth Amendment . . . "should be sealed and not made available for the purpose of tax prosecution" because "[t]o hold otherwise would force [the defendant] to choose between his Sixth Amendment right to counsel and his Fifth Amendment right against self-incrimination. Such a choice is constitutionally impermissible.").

government argued that the financial affidavit showed that the house searched was, in fact, Aguirre's house, since it showed that he paid $450 a month in rent.[6] Aguirre was convicted of aiding and abetting (with Rojas) to distribute a quantity of a mixture and a substance containing a detectable amount of cocaine hydrochloride and possessing firearms in furtherance of a drug trafficking crime.

When viewed against the other evidence found in this case, the district court's error in admitting the financial affidavit does not amount to reversible error. In particular, when they searched the residence on Wilburn, the officers found two handguns, approximately a quarter kilogram of powered cocaine, approximately seven grams of crack cocaine, and a wrapper that, based on their experience, they believed had previously contained a kilogram brick of cocaine. They also found large scales in the kitchen pantry that could be used for weighing drugs, a jar of a dietary supplement used as a cutting agent with cocaine, and a stainless steel pot on a stove with a white ring inside of it, which was consistent with cooking crack cocaine. The officers found a picture of Aguirre, together with a woman, at the Wilburn residence, and observed Aguirre exit and enter the residence, including with a key. Similarly, they observed Aguirre leave the residence and arrive at the body parts shop in conjunction with Solomon's illegal drug orders.

Under these circumstances, even though the district court erred in admitting the financial affidavit, that error did not amount to plain error because, in light of the other evidence, it did not affect the outcome of the district court proceedings.

### III. CONCLUSION

We find that the district court erred in admitting the financial affidavit. However, since the admission was not plain error, we **AFFIRM** Aguirre's convictions.

---

[6]The financial affidavit does not actually make it clear the address of the residence Aguirre paid rent on.