# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### January 2000 Session

## STATE OF TENNESSEE v. AARON McFARLAND

### Appeal from the Criminal Court for Shelby County
### No. 97-08162, Arthur T. Bennett, Judge

---

### No. W1999-01410-CCA-R3-CD  - Decided - August 4, 2000

---

The defendant was convicted of first degree murder and sentenced to life with the possibility of parole.  On appeal, he has presented as issues that the trial court should have suppressed his confession and that the evidence was insufficient to sustain his conviction.  Based upon our review, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the court, in which JOE G. RILEY, J., joined.  DAVID G. HAYES, J., filed a concurring opinion.

A C Wharton, Jr., Public Defender, and Tony N. Brayton, Assistant Public Defender, for the appellant, Aaron McFarland.

Paul G. Summers, Attorney General and Reporter, R. Stephen Jobe, Assistant Attorney General, William L. Gibbons, District Attorney General, Kevin R. Rardin Assistant District Attorney General, and Glen C. Baity, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant, Aaron McFarland, appeals as of right his conviction by a jury in Shelby County Criminal Court for first degree premeditated murder. The defendant raises two issues for our consideration:

> I.    Whether the trial court erred in denying his motion to
>       suppress his confession from evidence; and
>
> II.   Whether the evidence was sufficient to sustain a conviction
>       of first degree murder.

After a thorough review of the entire record, we have determined that the defendant's confession was properly admitted into evidence and that the evidence was legally sufficient to convict him of first

degree premeditated murder.  Accordingly, the judgment of the trial court is affirmed.

## PROCEDURAL BACKGROUND

On July 29, 1997, the defendant was indicted by the Shelby County Grand Jury on a single count of first degree premeditated murder.  He filed a pretrial motion to suppress a confession obtained while he was in custody.  The defendant's motion was denied, following a hearing, and the trial commenced immediately thereafter.  The jury returned its verdict on July 10, 1998, finding the defendant guilty as charged.  The defendant was sentenced to life in prison with the possibility of parole.  Motion for a new trial was denied by the trial court, and appeal was timely taken.

## FACTUAL BACKGROUND

The events leading to the murder for which the defendant was tried and convicted occurred on the streets of downtown Memphis during May carnival activities.  Close to midnight on Saturday, May 3, 1997, and into Sunday, May 4, two groups of young males, strangers to each other, were among the crowd in the vicinity of Beale Street.  Their encounter at the intersection of Fourth and Linden Streets ended in the shooting death of Terrell Deon Bullard, an eighteen-year-old freshman business major at The University of Memphis. Trial testimony was largely undisputed concerning the events leading up to and immediately following the murder.

The victim's mother testified that her son left home at about 11:00 p.m. on Saturday night, May 3.  Neitrick Presley testified that he, the victim, and four other friends—Rodell Jones, Samuel Carrol, Sharif James, and a guy named Patrick, later identified by Rodell Jones as Patrick Smith— had gone downtown together to Beale Street because of Memphis in May events.  The six young men were high school friends who had played sports together.  Presley testified that there was a carnival that night, and, as he and his friends were walking down the street to their car to leave, a young man walked up to one in their group and said, "I'll give you fifty dollars to take this bitch off my hands."  Presley and his friends just kept walking, trying to ignore the man.  Terrell Bullard, the victim, was walking a girlfriend whom he met at the carnival to her car at the time.  The propositioning stranger meantime circled to the front of Presley and his friends and walked into their midst, pushing Samuel Carroll.  The stranger demanded an apology, claiming to have been the one pushed by Carroll.  When Presley and his friends tried to just move on, the stranger whistled for reinforcements.  The new, larger group of some six males then began to  follow Presley and his friends, including, by now, the victim.  Presley testified that he and his friends felt cornered, and eventually a fist fight broke out.

Once the fight was over, Presley and his friends continued walking toward their car.  At this point, Carroll yelled, "He's got a pistol; he's got a pistol!"  Everyone scattered.  Presley and Rodell Jones ran toward a police officer across the street.  Presley testified that he turned to look back and saw the victim being grabbed from the back by his jacket  by one man while another, dressed in dark jogging pants and a white T-shirt, drew a pistol and shot the victim.  The following testimony was given by Presley during direct examination:

Q. Okay, what happened then?

A. Well, Terrell stumbled. He took, what, about two more steps and he fell to the ground. And me and Samuel ran to Terrell. And the guy with the pistol took off running. Well–yeah, the guy with the pistol, I guess, tried to take off running, but the police officer caught him.

Q. Did you see the man the police had in custody out there that morning?

A. Yes, sir.

Q. Was that the same person you saw do the shooting?

A. Yes, sir.

Q. What happened to Terrell after he was shot?

A. Well, like I said, me and Sam ran up to him. And it was, basically, like, you know, please, don't die, don't die Terrell. And he just–he looked up at me and Sam and he tried to push his way off the ground. And he just fell back down and blood started coming out of his mouth and his nose.

Q. Okay. Now, prior to that morning, Mr. Presley, had you ever seen the person who shot Terrell Bullard?

A. No, sir.

Q. Do you see here in the courtroom today the person who shot Terrell Bullard?

A. Yes, sir.

At this point, the witness identified the defendant.

On cross-examination, Presley testified that he was taken downtown a few hours after the shooting to give his account of what happened. He also reported that a cellular phone belonging to him but in the victim's possession at the time of the shooting was not found on the victim's body. During a bench conference, the prosecutor noted that a paragraph had just been found in the police report that was a summary of what Presley, Carroll, James, and Smith had told the police. There was no question and answer report. A copy of this summary was then provided to defense counsel.

Presley testified that he was not able to identify by facial features any of the individuals they fought with other than the defendant. Presley also testified under cross-examination that he had been shown pictures before trial by the prosecutor, and the pictures included one of the defendant and the victim. Presley testified that he was not given pictures to choose from, and he did not pick the defendant out of a line-up. He testified that he recognized the defendant because "you can't forget who killed your best friend." Defense counsel questioned Presley further about the police summary. Presley maintained that he told the police that he saw the person with black pants and white shirt shoot the victim, although this appeared to contradict the police report. On redirect, Presley testified that he never was given a copy of the police report to review what had been written concerning his interview.

Rodell Jones testified that he was with the victim and four other friends when the group went to Beale Street on Saturday, May 3, 1997. Jones testified to the following concerning the encounter with the propositioning stranger and the ensuing fight:

> A. As he [the propositioning stranger] walked past, I guess he stumbled over Carroll's foot. And we kept walking. The he–he then turned around and said, you can't say excuse me you old punk-ass nigger and all that stuff. And then Samuel was like, you don't have to disrespect me in front of all these people. Then this old guy who was down at the carnival came between us and he said, y'all stop all this stuff, that's what's wrong with black people now. Then the male who made the comment about the fifty dollars pushed the man against the fence. And we proceeded walking. And they started following us again. And the male whistled for more people to come down.

Jones testified that the victim had come back after walking a young lady to the car and "[w]hen he came back at that time everybody was fighting." Jones further testified to the following:

> Q. What did you hear this person you named as Aaron McFarland say?
>
> A. As the fight was continuing, he was jumping around. He made the statement, I'm fixing to kill me a mother fucker.
>
> Q. Okay. When you say he was "jumping around," what do you mean?
>
> A. Like dancing, whatever kind of dancing. They was just jumping around in circles with they [sic] arms crossed. And he made that comment. And I seen him reach into his pocket. So I went into my pocket and pulled out my phone. And then Carroll made a statement, he has a gun. So I ran and broke toward the police to

-4-

get the police officer.

> Q. Okay. How was - - this person you said who made the comment, I'm going to kill me a MF, how was he dressed?
>
> A. He had on some black jogging pants with a white V neck T-shirt. I believe he had one pants leg pulled up.
>
> Q. All right. This person you described as Aaron McFarland had you seen him prior to that night?
>
> A. No, sir.
>
> Q. Okay. Do you see him here in the courtroom today?
>
> A. Yes, sir.

At this point, Jones identified the defendant. Jones testified that when he heard Carroll say, "He's got a gun," he began running to get a police officer parked at Fourth and Linden. On cross-examination, Jones testified that he did not see who shot the gun.

Officer Tracy Gossett with the Memphis Police Department testified that on Saturday, May 3, and into Sunday, May 4, 1997, he was stationed with his partner at Fourth and Linden in downtown Memphis as part of his duties as a member of the street crime abatement team. Officer Gossett testified that there was a great deal of foot and vehicular traffic at this location because of Memphis in May activities. While he was in his car, a young man ran up to the car and told him that there was a fight going on . Officer Gossett exited the squad car and observed what he described as a large fight on the northeast corner of Fourth Street and Linden. He and his partner were on the opposite corner. There were some twenty to thirty people on the northeast corner with four or five people involved in the fight itself. He started walking towards the fight, heard a gunshot, and saw the flash from the gun. He did not see who had fired the gun. He saw one black male, approximately twenty years old, stumble out of the crowd and fall on the street and another male run towards Fourth Street. Officer Gossett testified to the following:

> Q. Did either you or your partner try to find out why this person was stumbling?
>
> A. My partner went towards the gentleman that fell. And the young man that ran, I started after him because the crowd was pointing towards him.
>
> Q. The person that ran can you describe him?
>
> A. He was a young male black wearing a white T-shirt, some sort of

-5-

black running pants.

Q. What direction was he running in?

A. He initially ran westbound on Fourth Street towards Linden–I'm sorry, on Linden towards Fourth, then he went back north on Fourth from Linden. And there was a field on the west side of Fourth Street, north of Linden, where the carnival people had parked their tractor-trailers and semis. And he ran where all their vehicles were parked in that area.

Q. Did you have him constantly in sight?

A. No, I did not.

Q. Where did you lose sight of him at?

A. When he ran into the field where the vehicles were parked, I stayed on Fourth Street running northbound kind of parallel to where he was running. And I caught him when he came out at from behind the vehicles at George W. Lee, which is the next street north.

Q. Approximately how long did this chase last?

A. Ten seconds.

Q. The person that you caught did he have a weapon on him or anything?

A. No, he did not.

Officer Gossett further testified that a search of the field for two to three hours did not turn up a weapon. Officer Gossett identified the person he chased and caught as the defendant who was then arrested and taken to juvenile court.

Sergeant Ronald F. Wilkinson, a twenty-five-year veteran of the Memphis Police Department and a homicide investigator, testified that on Sunday morning, May 4, 1997, he and his partner went to juvenile court to check out the defendant and bring him to the Criminal Justice Center, homicide office, for questioning. Sergeant Wilkinson testified that his partner contacted the defendant's grandparents, his legal guardians, who agreed to meet them at the homicide office because the officers wished to question the defendant. The grandparents, Robert and Essie McFarland, were waiting for them when Sergeant Wilkinson, his partner, and the defendant arrived at the Center at approximately 11:00 a.m. on May 4. Sergeant Wilkinson testified that all five of them went into a

small interview room.

After obtaining basic vital information such as name and date of birth, Sergeant Wilkinson testified that he read the Advice of Rights to the defendant. When asked what the Advice of Rights form contains, Sergeant Wilkinson testified as follows:

A.  It's his right to remain silent, his right to counsel. It's a standard form that we have of the Miranda warning–Miranda rights, I mean. I read this form to him. I gave him the form and asked him to read it. At this time he indicated he could not read. So I gave the form to his grandmother and grandfather who were sitting on either side of him. They both read it. We asked if they had any questions. They had no questions. Asked if, you know, they have any problems with us talking with Aaron about what had happened the night before. And they said, no, they wanted him to tell the truth.

Q.  So, Sergeant Wilkinson, did the defendant and his grandparents indicate that he understood his rights?

A.  Yes, sir, they did.

Q.  And did he agree to give you a statement concerning the death of Terrell D. Bullard?

A.  Yes, sir, he did.

Sergeant Wilkinson also testified concerning the Waiver of Rights form:

Q.  Could you read that Waiver of Rights, sir?

A.  I have read this statement of my rights. And I understand what my rights are. I'm willing to talk to you and answer questions. I do not want a lawyer at this time. I understand and know what I'm doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Q.  Okay. Is that followed by some signatures, sir?

A.  Yes, sir, it is.

Q.  What are those signatures?

A.  Aaron McFarland, Robert McFarland, and Ms. Essie Lee

McFarland.

The Advice of Rights form and the Waiver of Rights were admitted as evidence, both bearing a time of 11:28 a.m.

Sergeant Wilkinson testified that the defendant said that he had just got off work and was sitting on the curb when he saw a fight, heard a gunshot, jumped up and ran, and was arrested by police. The defendant was told that, according to witnesses, this was not correct. Sergeant Wilkinson testified that the grandparents then asked to speak to the defendant alone, so they took a break. A short time later, Essie McFarland came to the door and told them that the defendant was ready to tell the truth. After an oral confession, by the defendant, everyone went to the office of a secretary who entered a question and answer statement on her computer as Sergeant Wilkinson and Sergeant Botting questioned the defendant and the defendant responded. The hard copy of this statement was then taken back to the back into the interview room where the statement was read to them; they were allowed to read the statement; and then all three individuals, the grandparents and the defendant, initialed each page in red ink. This four-page statement was initialed by each individual beginning at 2:03 p.m. The heading of the statement included another statement of rights as follows:

> I'm going to ask you some questions regarding the above complaint. You have the right to remain silent. Anything you say can be used against you in a court of law. You have a right to have a lawyer either of your choice or court-appointed, if you're unable to afford one, and to talk with him before answering any questions and have him with you during questions if you wish. If you decide to answer questions now without a lawyer present, you still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.[1]

Sergeant Wilkinson read the entire question and answer statement into the record, including the following:

> QUESTION: Do you understand each of these rights I've explained to you?
>
> ANSWER: Yes, sir.
>
> QUESTION: Do you wish to make a statement now?
>
> ANSWER: Yes sir.

---

[1] This wording is identical to that on the standard Advice of Rights form.

-8-

QUESTION: Aaron, on Saturday, May 4, 1997, at approximately 12:45 a.m. did you shoot and kill someone in the area of Fourth and Vance?

ANSWER: Yes, sir.

QUESTION: Do you know who this person was?

ANSWER: No, sir.

QUESTION: What did you shoot him with?

ANSWER: A .9.

QUESTION: What color was that weapon?

ANSWER: Black.

QUESTION: Do you know if the weapon was a revolver or an automatic?

ANSWER: A [sic] automatic.

QUESTION: Why did you shoot him?

ANSWER: Cause Mike said it was my big chance.

QUESTION: Who is Mike?

ANSWER: The gang leader.

QUESTION: Which gang is he the leader of?

ANSWER: Seven Folk.

QUESTION: Which set?

ANSWER: Four-V.

QUESTION: Aaron, as you are giving this statement are you accompanied by Mr. and Ms. Robert McFarland, your grandparents?

ANSWER: Yes, sir.

QUESTION: What was meant by 'your big chance'?

ANSWER: To get in the gang.

QUESTION: Aaron, explain to me what happened before, during, and after the shooting.

ANSWER: I just got off work at 12 midnight, waiting on my mom to pick me up. I seen Mike and them standing on the corner of Beale and Fourth. Mike told me to come here. I said, 'What do you want, man?' And he said, 'Come walk down here with me.' Then we started walking down the street. Then we bumped into this other dude. And then two guys started arguing. Then dude got shot. He told them two guys to come on leave it alone it wasn't worth being in a fight. And then Mike and Four-V began to start fighting. And then this girl she hollered out she said, 'Come on Four-V.' Then Four-V started running down the street. Then Four-V broke out to fighting. Then Mike said to me, 'This is your big chance.' Then he handed me the gun, and then I shot the man, and then I stand there and look, then I broke out to running.

QUESTION: How far away from the victim were you when you shot him?

ANSWER: Three feet.

QUESTION: Where did you aim at the victim when you shot him?

ANSWER: The back of his head.

QUESTION: How many shots did you fire?

ANSWER: One.

QUESTION: Did you know the victim?

ANSWER: No, sir.

QUESTION: Had you ever met the victim?

ANSWER: No, sir.

QUESTION: What did you do with the gun after you shot him?

ANSWER: Gave it back to Mike.

QUESTION: Did you take anything from the victim?

ANSWER: No sir.

QUESTION: Did anyone else take anything else from the victim?

ANSWER: Yes, sir.

QUESTION: Who and what?

ANSWER: One of the Four-V gang members took a phone. He said, 'He won't be needing this.'

. . . .

QUESTION: What were you wearing last night when this occurred?

ANSWER: A white T-shirt and some black jogging pants on.

. . . .

QUESTION: What was your involvement other than shooting the victim in the fight at Fourth and Linden?

ANSWER: Mike just told me to shoot him in the head and that'd be my big chance. And he handed me the gun, and I shot him.

QUESTION: Aaron, is there anything else you can add to this statement that would aid us in our investigation?

ANSWER: I want to pay my respects to his momma, tell her I'm sorry for shooting her son. The only reason I shot him was to get in a gang.

QUESTION: Aaron, was this statement given freely and voluntarily without any threats or promises being made to you?

ANSWER: Yes, sir.

QUESTION: Can you read and write without the aid of eyeglasses?

ANSWER: No.

QUESTION: We will have Sergeant O'Conner to read your four-page

-11-

statement to you and your grandparents. And if you find it to be true
and correct without threats, promises, or coercion to initial the first
three pages in the bottom right-hand corner and to sign your name,
date, and time on the line provided below. Do you understand?

ANSWER: Yes, sir.

On cross-examination, Sergeant Wilkinson testified that he had questioned the defendant for at least forty-five minutes before he left the room. The defendant denied that he had any part in the murder until he changed his story and gave a statement of confession. Wilkinson testified that they went over questions and answers for about thirty minutes before having the defendant's statement printed out. On redirect, Wilkinson testified that neither the defendant nor his grandparents ever asked that the taking of the statement be stopped because they wanted a lawyer. On recross, Wilkinson testified that the grandparents were fully cooperative through the entire process and only wanted the defendant to tell the truth.

Elise Flowers, a transcriptionist with the Memphis Police Department Homicide Bureau, testified that the defendant and his grandparents were brought to her office by two investigators so that she might transcribe the defendant's statement. She testified that the computer monitor is positioned so that the parties can see the text as questions are posed by the investigators and then answers given by the person giving the statement. She further testified that at no point did any one object to the questions or answers as she completed the entry.

Among the last witnesses for the State were the officer who completed a gunshot residue collection kit on the defendant at juvenile court and the agent at the TBI laboratory who ran the test. This test was inconclusive because the control swab in the kit was contaminated. Finally, Dr. Wendy Gunther testified as an expert forensic pathologist who completed the autopsy on the victim. Dr. Gunther testified that the bullet had traveled through the victim's lung and straight through his heart, hitting more than one of the ventricles of the heart; exited the body cavity; and stopped just underneath the skin. The bullet was retrieved, and the witness testified that it was deformed so exact measurements were not possible but that it could certainly have been a nine-millimeter bullet. On cross-examination, Dr. Gunther testified that the gun was more than three feet away from the victim when fired, based on the lack of powder tattooing, or stippling, on the victim's clothes and skin.

The defendant and his grandparents testified as part of the defense's proof. Robert McFarland testified that he had just completed a ten-hour shift as a security guard and arrived at his home when the police called informing him that the defendant was in custody and asking him and his wife to come to the Justice Center. He and his wife went immediately and arrived at the Justice Center between 10:30-11:00 a.m. McFarland testified that once the defendant and the two officers were in the room where he and his wife were waiting, the defendant was told his rights.[2] McFarland

---

[2] At the suppression hearing, Robert McFarland testified that the defendant had been asked a "whole of lot of questions" before his rights were read to him.

-12-

testified that he, Robert McFarland, understood what those rights were. The officers repeatedly asked the defendant if he had killed the victim and the defendant repeatedly said that he had not. The witness testified that after approximately two hours, he asked the officers to step outside.[3] Once outside, he told Officer Wilkinson that he was going to get a lawyer. While he and the officers were still talking, his wife opened the door and told them that the defendant was ready to tell the truth. McFarland and the officers went back in the room and the defendant confessed to the murder. After some thirty minutes, they went to the office of Ms. Flowers where the defendant's statement was entered into the computer. McFarland testified that the defendant's rights were again read to him, including the fact that a lawyer would be appointed for the defendant if he could not afford one. McFarland testified that he told the officers that he could not afford a lawyer. He further testified that he did not ask about when he could talk to a lawyer because he thought that everything being said at this point was not really official. He testified that he, his wife, and the defendant all initialed each page and signed the statement at the end. According to the witness, it was at this point, after having been at the Justice Center approximately three hours, that they also signed the waiver of rights. The witness responded in the following way to defense counsel:

> Q. Was your mind clear when you were signing and initialing the papers?
>
> A. I was just wondering - - I was just wondering if - - like I say, I was just amazed that - - I think I even mentioned to them, I still don't believe it. But I just I had to go along because that's what I did. Like I said, if my wife had of told me what had happened, I never would have did any of this.
>
> Q. Now, you made the statement you had to go along. What do you mean by that?
>
> A. Nothing. I just made poor judgment to be frank with you.

On cross-examination, McFarland testified that he was seventy-one years old and had dropped out of school in the eleventh grade. He also identified each of the signatures on the back page of the confession as those of the defendant, himself, and his wife and stated that he observed the signing by the defendant and by his wife.[4]

---

[3] This length of time was refuted by the testimony of Sergeant Wilkinson, who testified to approximately forty-two minutes of questioning prior to the break, which came around lunch time, according to Wilkinson. Questioning of three hours, beginning at approximately 11:00 a.m., would not be consistent with the time noted on both the waiver form and the statement of confession.

[4] Essie McFarland testified that she never signed the four-page statement of confession and that the signature on the document was not hers.

-13-

Essie McFarland also testified for the defense.[5] Her testimony often contradicted that of other witnesses, including her husband. She testified that she and her husband arrived at the Justice Center at about 3:00 a.m. after the police called her home. She testified that the defendant was questioned for about fifteen minutes before the break when one officer and her husband left the defendant, her, and the second officer alone in the room. She testified that she signed papers while her husband was out of the room. She further testified that she was afraid that the officer questioning the defendant was going to hit him and that the defendant only said yes to the murder because she wanted him to as a way of protecting himself from being hit. She also testified that the officer did not hit the defendant; she was just scared that he was going to hit him. On cross-examination, this witness contradicted her own testimony, stating at first that she was present when the defendant's statement of confession was transcribed and then that she was not; that she arrived at the Justice Center in the dark of morning and then that it might have been 11:00 a.m. She testified that she told her grandson to lie about the murder but admitted that she was not present at the murder scene and did not provide her grandson with any of the detailed answers he gave to the officers when he confessed.

Among the witnesses called by the defense was Carlos Nash, who testified that he was in the crowd at the time of the shooting, heard a shot fired from behind him, turned around, and saw the defendant. He could not say whether the defendant fired fire the gun.

Sergeant Clarence Cox with the Memphis Police Department testified that he interviewed four of the victim's friends, Sharif James, Neitrick Presley, Patrick Smith, and Rodell Jones. Sergeant Cox further testified that he reduced his oral interview of each of the four to a written report. He testified that none of the persons interviewed claimed to have seen the actual shooting. On cross-examination, Sergeant Cox testified that he did not take a written statement from any of the four subjects he interviewed.

Samuel Carroll, one of the group of friends with the victim the night of the shooting, testified that he was the one in the fight with the propositioning stranger. Carroll's description of the events leading up to the shooting was consistent with prior testimony. Carroll testified that in his statement to the police he described the person whom he saw with a gun on Linden as a black make about 6'1" and weighing between 180 and 190 pounds, wearing a white, V-neck T-shirt and black jogging pants with a gold tooth on the right side of his mouth. He did not see the actual shooting. On cross-examination, Carroll identified the defendant as the person he saw with a gun.

Finally, the defendant chose to testify. He testified that he was waiting for his mother to pick him up from work at Pizza on Beale after midnight. He was wearing a white T-shirt and black jogging pants. At the time, he testified that he weighed about 160 pounds. The defendant is 6'2" tall. He was not able to name the street corner he was on because, even though he completed the eighth grade, he cannot read. Two other individuals, Mike and Twin, walked with him down a street when

[5]Essie McFarland is the defendant's forty-seven-year-old maternal grandmother, who raised the defendant from age three. She and her husband, Robert McFarland, who is not the defendant's biological grandfather, adopted the defendant when he was seven or eight and gave him their last name.

he saw Mike and Twin get into a fight with some individuals he did not know. When the fighting stopped, a person got shot, and the defendant ran towards Beale Street. The defendant further testified that he saw Mike shoot the victim.

The defendant testified that he was arrested and put in a police car and taken to juvenile court where an officer collected samples from his hands for a gunshot residue kit. Two other officers then came and took him to meet his grandparents at the Justice Center. He testified that the officers did not ask him any questions during the ride. Once he and his grandparents were together with the same two officers who had driven him to the Justice Center, the defendant testified to the following:

Q. Were your grandparents there the entire time?

A. Yes, ma'am.

Q. Were you asked to read anything during that time?

A. No, ma'am.

Q. Was anything read to you?

A. Yes, ma'am.

Q. Do you know what it was?

A. Some statements - - not no statements - - I done forgot.

Q. Did you understand what was read to you?

A. Yes, ma'am.

Q. Were questions asked of you by the police officers?

A. He had asked me did I understand it.

Q. And what was your answer?

A. I told him, yes, sir.

Q. And did you understand it?

A. Yes, ma'am.

Q. And based on that understanding did you answer questions?

-15-

A. Yes, ma'am.

The defendant testified that the questioning lasted some thirty minutes, and then his grandfather and one officer left the room; the other officer then left the room; and he was alone with his grandmother. He testified that his grandmother kept telling him to just tell the truth. After a period of time, both officers and his grandfather returned to the room, and the defendant then told them that he did the shooting. The defendant explained that he admitted to the killing, even though he did not do it, because his grandmother said "she would never tell me nothing wrong," and she told him to say that he did it. He testified that he thought he would get to go home if he said that he did it. Once the statement was transcribed, the defendant testified that one officer read it to him and then asked his grandfather to also read it to him, which his grandfather did. The defendant testified that his confession was false and that all the factual details he gave the officers were "[j]ust wonders in my head." The defendant denied being given a gun by Mike; denied being told by Mike that this was his big chance to get in the gang; denied that he was in a gang; and denied shooting the victim.

The following exchange occurred on cross-examination:

> Q. Okay. Well, the officers brought you down here, right?
>
> A. Yes, sir.
>
> Q. Okay. They got that part of it right?
>
> A. Yes, sir.
>
> Q. They advised you of your rights?
>
> A. Yes, sir.
>
> Q. You heard Sergeant Wilkinson testify to that, didn't you?
>
> A. Yes, sir.
>
> Q. Okay. And they got - - his testimony was correct; you were advised of your rights?
>
> A. Yes, sir.
>
> Q. You understood your rights?
>
> A. Yes, sir.

The defendant also testified that he was not scared, but his grandmother told him to tell the truth and instead he told lies. When asked, "So you lie when you need to and you tell the truth when you need

to; is that right?" the defendant answered, "Yes, sir."

## ANALYSIS

### I. Suppression of Confession From Evidence

The defendant asserts that his confession should have been suppressed as evidence under the Fifth Amendment because questioning occurred after his grandfather had requested an attorney. The defendant relies on <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) and <u>Edwards v. Arizona</u>, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981). The State argues that there is conflicting testimony on the issue of whether the defendant's grandfather requested an attorney during the interrogation of the defendant and that the findings of the trial court concerning this question of fact are binding upon appellate review unless the evidence in the record preponderates against them.

The United States Supreme Court held in <u>Miranda</u> that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444, 86 S. Ct. at 1612. Among those safeguards is the right to the presence of an attorney, either retained or appointed. Furthermore, if the accused "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." <u>Id</u>. at 445, 86 S. Ct. at 1612. The Court held in <u>Davis v. United States</u> that the wish to consult counsel must be clearly stated. <u>See</u> <u>Davis v. United States</u>, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355, 129 L. Ed. 2d 362 (1994) (stating that the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney").

Nevertheless, nothing in the subsequent doctrinal developments to <u>Miranda</u> places in doubt the efficacy of a knowing and intelligent waiver of any of the procedural safeguards protecting the accused's constitutional right against compulsory self-incrimination, including the right to counsel. <u>See</u> <u>id</u>. at 458, 114 S. Ct. at 2354 ("If the suspect effectively waives his right to counsel after receiving the <u>Miranda</u> warnings, law enforcement officers are free to question him.") (citing <u>North Carolina v. Butler</u>, 441 U.S. 369, 372-76, 99 S. Ct. 1755, 1756-59, 60 L. Ed. 2d 286 (1979)). Any waiver of the right to counsel must "not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused.'" <u>Edwards</u>, 451 U.S. at 482, 101 S. Ct. at 1884 (quoting <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023, 82 L. Ed 1461 (1938)). The Supreme Court held in <u>Edwards</u> that a valid waiver cannot be established simply by showing that a suspect continued to talk to police even after invoking the privilege to counsel, but rather,

> an accused, such as Edwards, having expressed his desire to deal with
> the police only through counsel, is not subject to further interrogation
> by the authorities until counsel has been made available to him,

> unless the accused himself initiates further communication, exchanges, or conversations with the police.

Id. at 484-85, 101 S. Ct. at 1885. The fact of initiation of further communication by the accused supports the voluntary nature of his waiver. The purpose of the Edwards rule is to "prevent police from badgering a defendant into waiving his previously asserted Miranda rights." Michigan v. Harvey, 494 U.S. 344, 350, 110 S. Ct. 1176, 1180, 108 L. Ed. 2d 293 (1990); see also Minnick v. Mississippi, 498 U.S. 146, 151, 111 S. Ct. 486, 489, 112 L. Ed. 2d 489 (1990) ("The rule ensures that any statement made in subsequent interrogation is not the result of coercive pressures.").

Consistent with federal Miranda jurisprudence, the courts of this state have held that "[o]nce an accused has invoked his right to counsel, he may nevertheless waive this right if (a) he initiates further communications, exchanges or converses[sic] with law enforcement officers and (b) the waiver is knowingly and intelligently made." State v. Tidwell, 775 S.W.2d 379, 386 (Tenn. Crim. App.), perm. app. denied (Tenn. 1989); see also State v. Claybrook, 736 S.W.2d 95, 103 (Tenn. 1987) (concluding that the defendant's rights were not violated when he initiated dialogue with law enforcement personnel after his request for counsel). Whether a waiver is voluntarily, knowingly, and intelligently made is determined by the totality of the circumstances under which the rights were waived. See State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998). This is true even when a juvenile suspect is involved. See id. at 583.

When it is the prosecution's contention that the accused waived his right to counsel having once invoked that right, the prosecution must meet a heavy burden of demonstrating by clear and convincing evidence that the accused initiated the subsequent discussion and that he voluntarily, knowingly, and intelligently waived his right to counsel. See Tidwell, 775 S.W.2d at 386. Of course, a threshold question is whether a request for counsel was actually made. Consistent with the Davis standard requiring a clear and unambiguous request for counsel, our supreme court has stated that "[i]f the suspect fails to make such an unambiguous statement, police need not cease questioning." State v. Huddleston, 924 S.W.2d 666, 670 (Tenn. 1996).

When this court reviews a trial court's ruling on a motion to suppress a confession from evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998) (citing Odom, 928 S.W.2d at 23). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. Testimony presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. See State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). The application of the law to the facts found by the trial court is a question of law and is reviewed de novo. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

We review the defendant's suppression issue according to the above legal standards to

determine: (1) whether the defendant was informed of his rights in accordance with the requirements of Miranda;[6] (2) whether the defendant waived those rights prior to the commencement of custodial interrogation by law enforcement officers; (3) whether the defendant subsequently, unequivocally requested counsel; and (4) whether the defendant freely, voluntarily, and knowingly waived his request for counsel.

At the suppression hearing and at trial, the defendant testified that before the officers began to question him, they informed him of his rights. At the suppression hearing, the defendant responded as follows:

> Q. Now, before they asked you if you did it had they explained any rights to you?
>
> A. Yes, ma'am.
>
> Q. What kind of rights did they explain to you?
>
> A. They told me I didn't have to talk to them if I didn't want to.
>
> Q. Now, what did you think that meant?
>
> A. I didn't have to make no statement if I didn't want to.

Sergeant Wilkinson testified at the suppression hearing that he first read the Advice of Rights form to the defendant and then gave it to his grandparents to read. Wilkinson also testified at the hearing that all three individuals signed the Advice of Rights form, which included a Waiver of Rights. The time marked on the form is 11:28 a.m. The defendant's grandfather testified that it was not until after questioning had begun that the officers informed the defendant of his rights, and the defendant's grandmother testified that the officers never said anything about rights. The trial court found that the defendant himself indicated that the officers did advise him of his rights prior to questioning and that he understood his rights. This is consistent with the testimony of Wilkinson. The evidence does not preponderate against the trial court's finding that the defendant was advised of his Miranda rights prior to questioning.

Second, as to the initial waiver, there was again conflicting testimony. Sergeant Wilkinson testified that the Advice of Rights and Waiver of Rights, a single-page document, was signed by the defendant and his grandparents after the rights portion had been read and before questioning had begun. The defendant and his grandparents placed the timing of the form much later in the process. Regardless of the time of the signing, the defendant testified at the suppression hearing on cross-examination to the following:

---

[6]The fact that the defendant was in police custody at the time of questioning is not controverted.

Q. Now, I believe it was your testimony that when the police officers brought you down here from juvenile court to their office they explained to you your rights; is that correct?

A. Yes, sir.

Q. And you understood your rights, right?

A. Yes, sir.

Q. You understood that you didn't have to talk to them if you didn't want to?

A. Yes, sir.

Q. But you decided to go ahead and talk with them?

A. Yes sir.

The trial court noted that it was logical to have the waiver signed at the time the rights were read. The court also noted that the defendant testified that he did sign the waiver. There is nothing in the record to indicate that his waiver was anything other than voluntary. The defendant had both grandparents with him the entire time; he testified that he was not afraid; he testified that he understood his rights; and he testified that he willingly talked to the officers. We conclude that the initial waiver was voluntary in that it was the product of a free and deliberate choice rather than the product of intimidation, and further, that it was made with full awareness of the nature of his rights and the consequences of his waiver, in that questioning would proceed.

Third is the question of invocation of the right to counsel. At the suppression hearing, the defendant's grandfather testified that during the initial questioning, when the defendant was advised of his rights, the officer told him that no statement had to be made without a lawyer. The grandfather then told the officers that he was not able to hire a lawyer. The following exchange then occurred:

Q. Now, do you know what they said to you when you said that?

A. They said that they would get me a lawyer.

Q. And then what did you say?

A. Well, it was nothing for me to say but to wait until - - you know, them to get a lawyer.

. . . .

-20-

Q. Both of them heard you say you could not hire a lawyer?

A. Right.

Q. And then they said you could get one - - they could get you one?

A. Well, they said the Court appoints it. That's what I - - that's where I was - - got lost. They said the Court would appoint me a lawyer.

The questioning continued for some forty-three minutes until the two officers and the grandfather all left the interview room, leaving the defendant and his grandmother alone in the room. The grandfather testified further to the following:

Q. Now, once you stepped outside the room – you say both officers stepped out with you?

A. I think one stepped out with me and then the other one came later. And I was telling them that I didn't think that he did it and that we was going to have to get a - - we were going to have to get a lawyer or something because by this time I had got - - I had got upset. I felt like I had did something.

. . . .

Q. Now, what did the officer say when you told him the second time about getting a lawyer?

A. Well, we was discussing about - - you know, discussing - - they said they believe he did it, and I said, I don't believe it. But anyway, we was out there about fifteen - - about fifteen or twenty minutes, then Aaron and my wife came out.

Q. And what?

A. And that's when - - that's when my wife said Aaron admitted it.

Q. Now, the fifteen or twenty minutes, did somebody go back in the room or did she come out on her own?

A. No, they come out. They both come out crying.

Q. And so they both come out crying, do you go back in the room?

-21-

A. Yes.

Q. Did the police officers go back in the room too?

A. Yes.

Q. Both of them or just one of them?

A. Both of them.

Q. Okay. Now, when you first get back in the room they're crying. What happens then?

A. Well, that's when Aaron started - - that's when Aaron started making this so-called confession.

. . . .

Q. Did you ever ask them again where the lawyer was or could you get one?

A. No, I didn't.

Q. Do you know why you didn't ask him that?

A. Well, like I said, I was just - - I was just overwhelmed. And my mind was running. And I was saying, I know he couldn't have did it, but there he was saying it - - I don't know.

At the suppression hearing, Sergeant Wilkinson testified on cross-examination that after approximately forty-two minutes of initial questioning of the defendant, they took a break. Wilkinson testified that he and the other officer left the interview room; then the grandfather came out; and the defendant was left alone with his grandmother. Wilkinson testified further to the following:

Q. Now, when the grandfather came out what was he doing out? Was he just standing there? Was he talking to you or some of the other officers?

A. I think he was talking to us, but I don't know about what.

Q. Talking to who?

A. I think he was out in the squadroom, and we were just in the

-22-

squadroom.

Q. Now, when he came out did he ask you about wanting to talk to a lawyer?

A. Not that I recall, no, ma'am.

Q. Do you recall whether he was talking to you?

A. I remember him being in the squadroom. Now, what was said I don't know.

Q. Who else do you remember being in the squadroom?

A. Well, Sergeant Botting was there. I'm sure Sergeant O'Conner was around. I don't know exactly who all was working that day.

Q. So in your testimony you don't know what he was talking about when he came outside the room?

A. I don't recall what he was talking about, no, ma'am.

Q. So he could have been talking about an attorney - - getting an attorney?

A. Well, I think that would have been noted. And, yes, ma'am, that would have been very important if that had been said.

Q. Well, you mean, it would have been noted, where?

A. Well, I mean, he would - - the interview - - if he'd wanted an attorney and didn't want to discuss it anymore, it would have been stopped.

Q. Well, but you don't - - you don't know what he even talked about; that's your testimony?

A. If he had said that, I would have known that, yes, ma'am.

Q. To you?

A. If he said it to - -

Q. If he had said that to you?

-23-

A. - - any investigator in homicide, they would have made it very clear.

Q. Well, now, I'm talking about what you know not what you're thinking someone else might have done, your personal knowledge. He didn't say that to you?

A. At no time did they ask for an attorney, no, ma'am.

As to the statements concerning getting a lawyer made by the grandfather while all five were in the interview room, the defendant testified at the suppression hearing that his grandfather said that "if I ain't did nothing he said he going to get me a lawyer." The defendant testified that nothing was said in response to this statement and that the questioning did not stop. As to the statements made by the grandfather while he and the two officers were outside the interview room, the defendant, of course, could not have heard those statements.

As noted above, the Supreme Court in Davis refused to require that the police cease questioning immediately upon the "making of an ambiguous or equivocal reference to an attorney." Davis, 512 U.S. at 459, 114 S. Ct. at 2355. The Davis Court further recognized that:

> requiring a clear assertion of the right to counsel might disadvantage some suspects who—because of fear, intimidation, lack of linguistic skills, or a variety of other reasons—will not clearly articulate their right to counsel although they actually want to have a lawyer present. But the primary protection afforded suspects subject to custodial interrogation is the Miranda warnings themselves.

Id. at 460, 114 S. Ct. at 2356.[7]

Here, although the trial court failed to address the specific issue of whether there had been an unequivocal invocation of the right to have counsel present by the grandfather, the trial court did focus on the importance of the Miranda warnings themselves and concluded that the defendant understood his right to remain silent and to have a lawyer present. The form setting out those rights stated plainly and clearly that, "You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish." Nothing in the record indicates that the right to counsel was ever clearly invoked. In fact, at one point in his suppression hearing testimony, the grandfather stated that he asked to speak with the officers outside the interview room because he was ready to "concede that we need a lawyer." Neither the defendant nor his grandmother testified that the grandfather clearly asked that a lawyer be present at questioning. The testimony

_____

[7]In Davis, the defendant said, "Maybe I should talk to a lawyer." Id. at 455, 114 S. Ct. at 2353. The officers then sought to clarify whether the defendant was actually asking for a lawyer, and the defendant replied that he was not; questioning continued.

of Sergeant Wilkinson concerning what was said on the break maintained that no request for an attorney was made by the grandfather. The grandfather's testimony is itself ambiguous since he testified that on the break he told the officers that the questioning was not getting anywhere, that he believed his grandson was innocent, and that he was going to get a lawyer, even though he testified that he had previously told the officers he could not afford a lawyer. On direct examination, he was asked, "When you made that statement did you see a lawyer?" He responded, "No, we didn't because while we was talking and everything that's when my wife came out and said that Aaron had confessed." We conclude that no clear and unequivocal invocation of the right to counsel was made.

Even had such a request been made, the record indicates that the defendant initiated the conversation with the officers following the break in which he confessed to the killing of the victim. The impetus for the confession was the private conversation with his grandmother, not any coercive overreaching of the State. The defendant freely volunteered the confession. It was made knowing what his Miranda rights were and with the intellectual capacity to understand those rights. Although the defendant testified that he believed the result of his confession would be that he would be allowed to go home, the trial court did not find this to be credible:

> Now, I don't know where he added that up to mean this if I confess to killing somebody I can go home and forget about it. I don't think even he thought that would be the case. I don't think the defendant even dreamed that that would be the case if he said, I killed a man, that it would be all right. Now, he may have thought that he may not have to do as much time.

We conclude that the defendant was fully informed of his Miranda rights; that he voluntarily, knowingly, and intelligently waived those rights; that he did not unequivocally invoke his right to counsel; but that even if he did invoke this right, the evidence is clear and convincing that he initiated the conversation with the officers and voluntarily, knowingly, and intelligently waived his right to counsel. Accordingly, the defendant's Fifth Amendment right to counsel claim is without merit; therefore, his confession was properly admitted as evidence.

## II. Sufficiency of the Evidence

The defendant challenges the sufficiency of the evidence, contending that the State failed to carry its burden of proving beyond a reasonable doubt that the homicide was premeditated. When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); see also Tenn. R. App. P. 13(e). This applies to convictions based on either direct or circumstantial evidence or a combination of the two. See State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App.), perm. app. denied (Tenn. 1990). In determining the sufficiency of the evidence, we do not reweigh the evidence or substitute our own inferences for those of the jury. See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of witnesses, the weight to be given

their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.  See Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978).

The defendant here was convicted of first degree premeditated murder, which is defined as a "premeditated and intentional killing of another."  Tenn. Code Ann. § 39-13-202(a)(1). "Premeditation" requires that the act be done after the exercise of reflection and judgment.  It means that the "intent to kill must have been formed prior to the act itself." Id. § 39-13-202(d). That is not to say that the purpose to kill must have "pre-existed in the mind of the accused for any definite period of time," but only that the mind of the accused must be "sufficiently free from excitement and passion as to be capable of premeditation." Id.

All homicides are presumed to be second degree murder, and the State must affirmatively prove premeditation in order to elevate the offense from second to first degree murder.  See State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992).  The presence or absence of premeditation is a question for the jury to determine, and it may be inferred from the circumstances surrounding the killing.  See State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993), perm. app. denied (Tenn. 1994).  Factors which tend to support the existence of premeditation have been enumerated by our supreme court in State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997) as follows:

> the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing.

The defendant argues that his intent was not to kill the victim but just to get into the gang. He also argues that he was not sufficiently free of passion and excitement at the time because of the street fight.  The fact that he was motivated by a desire to become a member of a gang does not obviate the intent to kill. According to our criminal code, a person acts intentionally "with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(a)(18).  There was evidence that the defendant stated, "I'm fixing to kill me a mother fucker."  He admitted to aiming a gun at the back of the victim and firing it at close range.  As to his being caught up in the heat of passion and excitement, there was no evidence that the defendant was involved in the fight at all.  On the contrary, the evidence was that the defendant only wanted to join the gang and knew that this was his "big chance."  Although he had not brought the gun to the corner of Fourth and Linden that night, he took it from the gang leader, fired it, gave it back, and ran.  The victim was unknown to him; the victim could have been anyone the gang leader told him to shoot—a fact that speaks to the terrible cruelty of this killing.

While we note the decisive impact of a confession on the adversarial process, the other aspects of this trial provided sufficient evidence to support the conclusion of the jury that the defendant, without passion, after exercising judgment and reflection, consciously engaged in conduct which caused the victim's death.  Therefore, we conclude that the evidence in this record is sufficient

to establish premeditation.

## CONCLUSION

Having considered the entire record, we conclude that the trial court's admission of the defendant's confession into evidence was proper and that the evidence supported the jury's conviction for first degree premeditated murder.  The judgment of the trial court is affirmed.

_____
ALAN E. GLENN, JUDGE