# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs December 2, 2003

## STATE OF TENNESSEE v. TERRANCE LEWIS

**Direct Appeal from the Circuit Court for Henderson County**
**Nos. 0055-1, 0056-1     Roy B. Morgan, Jr., Judge**

---

**No. W2003-00356-CCA-R3-CD  - Filed January 30, 2004**

---

The defendant was convicted by a Henderson County Circuit Court jury in consolidated cases of aggravated robbery, a Class B felony, and especially aggravated robbery, a Class A felony.  He was sentenced by the trial court as a Range I, standard offender to eight years for the aggravated robbery conviction, and as a violent offender to twenty years for the especially aggravated robbery conviction, with the sentences ordered to be served concurrently, for an effective sentence of twenty years in the Department of Correction.  He raises essentially one issue on appeal: whether the trial court erred in denying his pretrial motion to suppress his statement to police.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

Jack S. Hinson, Lexington, Tennessee, for the appellant, Terrance Lewis.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Bill R. Martin, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On December 31, 1999, the defendant, Terrance Lewis, was arrested by Lexington police officers in Shreveport, Louisiana, on warrants that had been issued for his arrest in connection with several recent armed robberies in Lexington.  During his transport back to Tennessee and the following day during an interview at the Lexington Police Department, the defendant issued statements in which he confessed his involvement in the crimes.  On June 12, 2000, the Henderson County Grand Jury returned separate indictments charging him, *inter alia,* with aggravated robbery

for robbing an employee of the Tobacco Shack at knifepoint on December 16, 1999; attempted aggravated robbery for attempting to rob at knifepoint a clerk of a Lexington Amoco service station on December 17, 1999; and especially aggravated robbery for robbing the manager of the Bill's Dollar Store at knifepoint on December 21, 1999, resulting in serious bodily injury to the victim.

The defendant filed a motion to suppress on February 15, 2001, arguing that his statement was the product of an illegal arrest, was taken in violation of his Fifth and Sixth Amendment rights to counsel, and was not knowingly and voluntarily given. Three witnesses testified at the March 5, 2001, suppression hearing: Lexington Police Investigators Michael Harper and Scottie Kizer, the two officers who arrested the defendant and recorded his statement, and the defendant. Investigator Harper testified as follows. On December 31, 1999, the defendant, who was in Shreveport but had heard from relatives about the warrants for his arrest, participated in a three-way telephone conversation with his sister and the Lexington Chief of Police, in which he stated his desire to turn himself in to Investigator Kizer. At that point, the police chief called Investigators Kizer and Harper into the police station, and they in turn spoke by telephone with the defendant, who told them he would maintain telephone contact with them if they came to Shreveport to pick him up.

Investigators Harper and Kizer left Lexington at about 11:00 a.m. on December 31 and arrived in Shreveport at approximately 7:00 p.m. Upon their arrival, they first informed a Shreveport police officer in the area about their business and then went to a Circle K convenience store where the defendant had agreed to meet them. Approximately fifteen minutes later, the defendant walked up to the store. After introducing themselves and having the defendant identify himself to them, they took him into custody, read him his <u>Miranda</u> rights, searched him, and placed him in the back of their patrol car. During the drive back to Lexington, the defendant gave a statement admitting his involvement in the robberies. According to Investigator Harper's testimony: "He did advise me that he didn't call us all the way to Shreveport to lie to us, that he wanted to go home and he was turning hisself [sic] in, and at that point he did give a statement admitting to the aggravated robberies we had here in Lexington." They made one stop during the drive back to Lexington in order to get the defendant something to eat and to allow him to use the restroom.

Investigators Harper and Kizer arrived with the defendant in Lexington at approximately 3:00 a.m. on January 1, 2000, and booked him into the county jail. At 2:00 p.m. the same day, they took the defendant from the jail to the police department, where Investigator Harper read the defendant his <u>Miranda</u> rights and had him sign a waiver of rights form, before taking a six-page statement from him in which he admitted his involvement in the crimes. The defendant was sober and "in a sound state of mind" when he gave his statement, and he provided numerous details matching the information the investigators already knew about the crimes.

On cross-examination, Investigator Harper testified he did not know who had initiated the three-way telephone call among the chief of police, the defendant, and the defendant's sister. He said the defendant's ex-girlfriend had identified the defendant from the Amoco service station's surveillance tape, and the defendant's family members had been informed of that fact. The defendant did not appear to be under the influence of any drug when he turned himself in at the

convenience store, and Investigator Harper did not smell any alcohol on him. In addition, the defendant answered in the negative when asked if he had been drinking or smoking anything. The written statement the defendant gave at the police department was essentially the same as the oral statement he provided while in the patrol car, which was not recorded. Investigator Harper wrote out the six-page statement for the defendant at the defendant's request.

Investigator Kizer testified he accompanied Investigator Harper to Shreveport on December 31 to arrest the defendant and participated with him in taking the defendant's statement at the police department the following afternoon. He agreed with Investigator Harper's testimony regarding the events that transpired, including the reading of the defendant's rights prior to taking his statement. On cross-examination, he testified he knew the defendant from the defendant's prior arrest for theft of property. He said Investigator Harper read the defendant his <u>Miranda</u> rights after they arrested him and placed him in the back of their patrol car in Shreveport, and the defendant began telling them about his involvement in the crimes immediately after they started on their trip back to Tennessee. The defendant never asked for an attorney, and they made no promises of leniency in exchange for his statement. Investigator Harper wrote the defendant's six-page statement for him the following day at the police station and read it aloud to the defendant in its entirety.

The defendant testified he was in Shreveport when his sister informed him the police wanted him for questioning in connection with the Tobacco Shack and Amoco robberies. His sister first contacted the Lexington police chief and then called him again to participate in a three-way telephone conversation with her and Investigator Kizer. In his testimony, the defendant suggested it was his sister or his aunt and uncle who arranged his meeting with the officers at the Circle K store in Shreveport:

> Q Did you set up a place and time and meet them [the investigators]?
>
> A My sister – I got an uncle named Andrew Lewis. He stays up here in Tennessee. And my sister and my uncle and my auntie 'nem, they was – from the way they told it, they said they had me on camera from – that they seen my face on the dollar store and the Tobacco Shack robbery and that I had done it, and my auntie 'nem, they believe in doing – you know, they don't believe in wrongdoing, and they turned me in, and I went to the Amoco, walked up there with one of my cousin's friends – I mean, not the Amoco but the Circle K in Shreveport with one of my cousin's friends.
>
> Q Okay. So you didn't go there to meet the officers?
>
> A I went there – I was going to the store, but I didn't know they was going to be up there at the time.

The defendant testified the investigators told him he was under investigation, rather than arrested, and did not read him his rights until the next day when they spoke to him at the police station. He said he had been drinking a little and had used cocaine and marijuana when he went to the Circle K. The officers stopped once during the drive to get gasoline in Grenada, Mississippi, but the defendant did not get out of the car to use the restroom. The defendant testified Investigator Harper told him he would receive less than eighteen months for the crimes, which the defendant had understood would be served on probation or another similar program. The defendant said Investigator Kizer asked him during the ride why he had committed the robberies, but the defendant implied in his testimony that he did not give any statement at that time:

> Q  Were you questioned any on the ride back from Shreveport, Louisiana?
>
> A  All it was, [Investigator Kizer], he asked me – he just asked me why I had did it and what I had done got into, and that's it, and the other times, I was asleep going back. The only time – The other time I woke up was when we got in Grenada, Mississippi, and we was at the store getting gas in Grenada, Mississippi.

The defendant acknowledged he signed the six-page written statement at the police station the following day but denied that he had read it or had it read to him before he signed it. He claimed he had three grams of cocaine hidden in his shoe when he was taken to the jail after the drive from Shreveport and stayed up all night taking the drug, using the last of it approximately thirty-five to forty-five minutes prior to being taken to the police station to give his statement. The defendant asserted that the jailers neglected to search him until he was returned to the jail from the police station.

The defendant testified he asked the officers if he was supposed to have an attorney but did not reveal what answer, if any, the officers gave in response to his question. However, from the following exchange between the defendant and his trial counsel, he appears to have decided it was unnecessary for him to have an attorney present during questioning:

> Q  One question I forgot to ask you. Mr. Lewis, did you ever ask for an attorney during the questioning?
>
> A  I asked was I supposed to have one, but at the time I didn't know nothing about the system or none of that, and I was – you know what I'm saying, I didn't have nothing – I wasn't hiding nothing, so what would I need an attorney for. So, I signed the paper.
>
> Q. But you did ask if you was [sic] supposed to have one?
>
> A  Yeah.

At the conclusion of the hearing, the trial court denied the defendant's motion to suppress his statement. Among other detailed oral findings of fact and conclusions of law, the trial court found that, regardless of who initiated the contact, the defendant voluntarily participated in the three-way telephone call and voluntarily turned himself in to the Lexington police officers in Shreveport. The trial court further found as follows:

> It's also clear from the proof today that the Defendant did sign each and every page of this six-page document at the bottom, and also attached to the back of the first page is a signed waiver of rights. The officers have testified they explained the rights to him before this statement was taken and reduced to writing. It is a handwritten statement. I do know after reviewing the statement, the rights waiver is not – it's got a date, it doesn't have a time, but the statement itself has the same date and a time of 1400 hours. There are also "TL" initials for modifications in the written statement indicating that Terrence Lewis approved deletions and scratching out of certain words in the statement. There's also indication, according to the Defendant's testimony, that the references made in the statement, handwritten statement, regarding the Amoco station, is exactly what he told law enforcement officers. He seems to have a clear recollection of what he told them, and that is, in fact, in the statement. He mentions the use of drugs, possibly cocaine or marijuana, on the way to the store where he surrendered himself. This statement was, in fact, taken the next day. He mentioned drugs in his shoes that he might have used later, but at all times the officers indicated that there was no indication that he was under the influence of anything when the statement was given. So the Court has no reason to believe he did not understand and communicate properly with the officers.
>
> . . . .
>
> I do want to make it clear in an order that the Motion to Suppress is denied for the reasons stated, the Court finding that the statement was freely, voluntarily and intelligently given by the Defendant after he was advised of his rights[.]

The trial court additionally found, at the conclusion of the hearing on the defendant's motion for a new trial, that the defendant had voluntarily turned himself in to police and, therefore, "the method in which the Defendant came back is not a factor that would be involved in the suppression of the statement."

# ANALYSIS

The defendant argues his statement was the "fruit of the poisonous tree," *i.e.*, the product of his unlawful arrest in Shreveport where the officers failed to follow established extradition procedures and that the statement was not knowingly and voluntarily made due to the officers' failure to inform him of his Miranda rights before questioning him in the patrol car, their promise of leniency in exchange for his statement, and his drug and alcohol use prior to and following his arrest. He also argues that the statement was taken in violation of both his Fifth and Sixth Amendment rights to counsel, which were triggered upon the filing of his arrest warrants and his request of whether he needed an attorney during questioning. The State argues that the evidence does not preponderate against the trial court's findings that the defendant voluntarily turned himself in to police and made a valid and knowing wavier of his rights before giving his statement. We agree with the State.

In State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996), our supreme court clarified the standard of review to be applied to a trial court's rulings on suppression issues:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise. . . . Hereafter, the proper standard to be applied in reviewing suppression issues is the "preponderance of the evidence" standard.

However, the trial court's application of the law to the facts is a question of law which the appellate court reviews *de novo*. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The defendant first argues that his statement should be suppressed under the "fruit of the poisonous tree" doctrine enunciated in Wong Sun v. United States, 371 U.S. 471, 488, 83 S. Ct. 407, 417, 9 L. Ed. 2d 441 (1963). The defendant contends the Lexington police officers had no authority to arrest him without following the proper extradition procedures to effectuate a valid arrest in Louisiana, and his statement should therefore be suppressed as the product of an unlawful arrest. The State notes that under Elliott v. Johnson, 816 S.W.2d 332, 339 (Tenn. Crim. App. 1991), a case cited by the trial court in overruling the defendant's motion for a new trial, "once the [defendant] is brought within the boundaries of this state, absent outrageous or illegal conduct by the arresting authorities so extreme as to shock the conscience, he may be placed upon trial for any charges pending." The State argues there was no outrageous conduct involved in the Shreveport arrest of the defendant and

points to the trial court's finding that the arrest occurred as a result of the defendant's voluntary cooperation with authorities; thus, the manner of his arrest did not constitute grounds for suppressing the statement.

Although we agree there was no outrageous conduct involved in the defendant's arrest, we do not find Elliott particularly applicable to this case. The issue in Elliott was whether the manner in which law enforcement officers brought a criminal defendant to Tennessee from Virginia, which did not comport with proper extradition procedures, violated his due process rights and therefore barred his Tennessee prosecution for his offenses. Id. at 337. Here, the issue is whether the officers' arrest of the defendant in Louisiana without following proper extradition procedures constituted an unreasonable seizure under the Fourth Amendment, such as to require that his subsequent statement be suppressed at his trial. We conclude that it did not.

The record supports the trial court's finding that, regardless of who initiated the contact, the defendant voluntarily communicated with the Lexington police officers, cooperated in his arrest by turning himself in at the Shreveport store, and voluntarily gave his statement. The defendant suggested in his testimony that he was turned in by relatives and surprised by the arrest. However, according to both officers' testimony, the defendant, who knew of the warrants for his arrest, agreed in a telephone conversation to be arrested and transported back to Tennessee and arranged the place and time for the meeting. In so doing, the defendant was for all practical purposes waiving extradition to Tennessee.

In State v. Huddleston, 924 S.W.2d 666, 674 (Tenn. 1996), an unlawful detention case involving a defendant's failure to be given a prompt probable cause determination following a warrantless arrest, our supreme court observed that "the exclusionary rule [under which evidence obtained as the result of a Fourth Amendment violation is suppressed] was designed to protect Fourth Amendment guarantees by deterring lawless searches, seizures, and arrests." The court further observed, however, that the United States Supreme Court has limited the application of the exclusionary rule to those situations in which it "is likely to achieve a substantial deterrence of official wrongdoing, and the cost of applying the rule -- exclusion of reliable evidence -- does not outweigh the benefits achieved by its application." Id. at 673 (citing United States v. Leon, 468 U.S. 897, 915-21, 104 S. Ct. 3405, 3416-20, 82 L. Ed. 2d 677 (1984)). The Huddleston court recognized, moreover, that even in those situations in which the exclusionary rule should apply, a defendant's subsequent statement need not be suppressed if it is found to have been sufficiently an act of free will to purge the primary taint of the unlawful arrest or detention. Id. at 674. The following four factors are relevant to a determination of whether an ensuing statement was sufficiently an act of free will to purge the taint of the original Fourth Amendment violation:

> (1) the presence or absence of Miranda warnings; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and finally, of particular significance, (4) the purpose and flagrancy of the official misconduct. The burden of

proving, by a preponderance of the evidence, the admissibility of the challenged evidence rests on the prosecution.

Id. at 674-75 (citing Brown v. Illinois, 422 U.S. 590, 603-04, 95 S. Ct. 2254, 2261-62, 45 L. Ed. 2d 416 (1975); Williams v. State, 348 N.E.2d 623, 628 (Ind. 1976)).

In our view, the officers' failure here to comply with the applicable extradition procedures in transporting the defendant from Louisiana to Tennessee does not rise to the level of official wrongdoing, such as a warrantless arrest made without probable cause, see id. at 673, that the exclusionary rule was designed to deter. Although the officers apparently failed to follow the procedures for having the defendant waive extradition to Tennessee, the record establishes they had valid warrants for the defendant's arrest, and the defendant voluntarily turned himself in to them at the Shreveport convenience store and agreed to be transported back to Tennessee. Furthermore, the record also establishes that it was either the defendant or his family members who initiated the contact, and that the defendant was given his Miranda warnings and signed a waiver of rights form before giving his statement at the police department the following day. Under these circumstances, we simply cannot conclude that the officers' failure to comply with the relevant extradition statutes required that the defendant's subsequent statement be suppressed.

The defendant next argues his statement should have been suppressed as taken in violation of his Fifth and Sixth Amendment rights to counsel, which were triggered upon the filing of his arrest warrants and his request of the officers of whether he needed an attorney during questioning. He also contends the evidence shows his statement was not knowingly and voluntarily made due to the officers' failure to provide him with his Miranda warnings prior to initiating questioning in the patrol car, his drug and alcohol use before he gave his statement, and the officers' promise of leniency in exchange for the statement.

A defendant's Sixth Amendment right to counsel attaches when the adversarial judicial process has begun. Michigan v. Jackson, 475 U.S. 625, 629, 106 S. Ct. 1404, 1407, 89 L. Ed. 2d 631, 639 (1986); Brewer v. Williams, 430 U.S. 387, 401, 97 S. Ct. 1232, 1240, 51 L. Ed. 2d 424 (1977). In Tennessee, the adversarial judicial process is considered initiated upon the filing of the formal charge, which includes the arrest warrant, indictment, presentment, or the preliminary hearing in cases in which a warrant was not obtained prior to the defendant's arrest. State v. Mitchell, 593 S.W.2d 280, 286 (Tenn.), cert. denied, 449 U.S. 845, 101 S. Ct. 128, 66 L. Ed. 2d 53 (1980). "Judicial proceedings are considered initiated, and thus Sixth Amendment rights attach, at the time an arrest warrant issues, a preliminary hearing is held (if no arrest warrant is issued), or an indictment or presentment is returned." State v. Jackson, 889 S.W.2d 219, 222 (Tenn. Crim. App. 1993).

Since the defendant's arrest warrants preceded his arrest, his Sixth Amendment right to counsel had attached at the time the officers picked him up in Shreveport. "Once formal criminal proceedings begin, the Sixth Amendment renders inadmissible in the prosecution's case-in-chief statements 'deliberately elicited' from a defendant without an express waiver of the right to counsel."

State v. Land, 34 S.W.3d 516, 523 (Tenn. Crim. App. 2000) (quoting Michigan v. Harvey, 494 U. S. 344, 348, 110 S. Ct. 1176, 1179, 108 L. Ed. 2d 293 (1990)).

A criminal defendant also has a right to counsel that is encompassed within his Fifth Amendment right against self-incrimination. See Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966); Huddleston, 924 S.W.2d at 669. Both the U.S. and Tennessee Constitutions protect a defendant from being compelled to give evidence against himself. See U.S. Const. amend. V; Tenn. Const. art. I, § 9. To be admissible at trial, a confession made while under custodial interrogation must be shown to have been freely and voluntarily made, after the defendant's knowing waiver of his constitutional right to remain silent and have an attorney present during questioning. See Miranda, 384 U.S. at 444, 86 S. Ct. at 1612. In State v. Hinton, 42 S.W.3d 113 (Tenn. Crim. App. 2000), this court noted that a defendant's knowing waiver of his Miranda rights under the Fifth Amendment is sufficient to constitute a knowing waiver of his Sixth Amendment right to counsel:

> Miranda warnings sufficiently apprise defendants of their Fifth Amendment right to remain silent. In addition, the United States Supreme Court has held that Miranda warnings sufficiently inform defendants of their Sixth Amendment right to counsel such that a subsequent waiver is knowing. Patterson v. Illinois, 487 U.S. 285, 293-94, 108 S. Ct. 2389, 2395, 101 L. Ed. 2d 261 (1988). The Court determined that by "telling [Patterson] that he had a right to consult with an attorney, to have a lawyer present while he was questioned, and even to have a lawyer appointed for him if he could not afford to retain one on his own, [this] conveyed to [Patterson] the sum and substance of the rights that the Sixth Amendment Provided him" such that his subsequent waiver was knowing. Id. Miranda warnings specifically inform defendants that they have the right to remain silent and the right to have an attorney present. Thus, Miranda warnings serve to make defendants aware of those specific rights.

Id. at 125.

The defendant claimed the investigators failed to give him his Miranda warnings upon his arrest, they promised him leniency in exchange for his statement, and he was under the influence of cocaine, marijuana and alcohol at the time of his initial arrest and under the influence of cocaine when he gave his written statement. He also questioned his need for an attorney during the taking of his written statement. The investigators' testimony, by contrast, was that the defendant was given Miranda warnings both upon his arrest at the Circle K store in Shreveport and again the following day prior to the taking of his written statement, that he was searched upon his arrest and appeared to be sober both at the time of his arrest and at the time he gave his written statement, that nothing was promised him in exchange for his statement, and that he never requested an attorney. As noted by the trial court, in addition to the officers' testimony respecting the defendant's knowing waiver of his

right to remain silent or to have counsel present, the defendant's signature appears on the admonition and waiver of rights form and on the bottom of each of the six pages of his written statement, which also contains several deletions and insertions beside his initials, indicating the defendant read and approved changes in the document, despite his claim to the contrary.

Based upon this record, the evidence does not preponderate against the trial court's findings that the defendant's statement was knowingly and voluntarily entered after he had been given adequate Miranda warnings and signed a valid waiver of his right to remain silent or to have an attorney present during questioning. We conclude, therefore, that the defendant made a knowing and valid waiver of both his Fifth and Sixth Amendment rights to counsel, and thus, that the trial court did not err in denying his motion to suppress his statement at trial.

## CONCLUSION

We conclude that the evidence does not preponderate against the trial court's findings that the defendant's statement was knowingly and voluntarily made following his valid waiver of his right to remain silent or to have counsel present during questioning, and thus, that the trial court properly denied the defendant's motion to suppress his statement. Accordingly, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE